**RAYTHEON COMPANY,**
Plaintiff, Appellant,

v.

**AUTOMATED BUSINESS SYSTEMS,**
INC., Defendant, Appellee.

No. 89–1157.

United States Court of Appeals,
First Circuit.

Heard June 5, 1989.

Decided Aug. 2, 1989.

As Amended Oct. 4, 1989.

Gael Mahony with whom Frances S. Cohen, Thomas J. Gallitano, Hill & Barlow and Marguerite T. Grant, Boston, Mass., were on brief, for plaintiff, appellant.

Richard L. Nathan with whom Ann E. Hopfenbeck, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, Colo., H. Joseph Hameline, Samuel M. Starr and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Mass., were on brief, for defendant, appellee.

Before BREYER, REINHARDT,* and SELYA, Circuit Judges.

REINHARDT, Circuit Judge:

This case requires us to determine whether commercial arbitrators have the power and authority to award punitive damages pursuant to a general contractual arbitration clause which does not specifically provide for the award of such damages. In January 1988, appellant Raytheon Company ("Raytheon") received some unpleasant news. The panel of arbitrators that had presided over an arbitration between Raytheon and a former dealer in Raytheon-manufactured word processing equipment, Automated Business Systems ("Automated"), had found in favor of Automated and had awarded the prevailing party not only compensatory damages, attorneys' fees and expenses, but also $250,000 in punitive damages. Raytheon sued in federal district court, in the District of Massachusetts, to vacate the entire award. Automated, not surprisingly, opposed the suit and filed a motion seeking confirmation of the arbitral award. The district court refused to vacate, and issued an order confirming the award. Raytheon appealed, although it now seeks to have us vacate only that portion of the arbitrators' award which imposed punitive damages against it. We affirm.

* Of the Ninth Circuit, sitting by designation.

## I.

In 1978, Lexitron, at that time a subsidiary of Raytheon, entered into an exclusive dealership contract with Automated under which Automated would distribute word processing equipment manufactured by Lexitron. The contract was twice extended. Although Raytheon tendered a new proposed agreement in 1982, this document was never executed by the parties, and it appears that they continued to operate under the 1978 agreement until Raytheon terminated their relationship altogether in 1984. The 1978 contract contained a general arbitration clause which provided in relevant part that:

> [a]ll disputes arising in connection with the Agreement shall be settled by arbitration ... conducted according to the rules of the American Arbitration Association.

The parties also provided that the law of California would govern the interpretation of the agreement.

In 1986, Automated filed the final version of its demand for arbitration, in which it claimed that Raytheon had breached the parties' agreement, had violated its duty of good faith and fair dealing, and had committed a number of fraudulent and deceitful acts, rendering it liable to Automated under various tort theories of fraud, deceit and conspiracy, as well as for simple breach of contract. Automated sought compensatory and consequential damages. Additionally, in a single sentence in one of its claims for relief, Automated requested that the arbitrators award punitive damages on the tort claims it had asserted against Raytheon.

On the day the arbitration was to begin, Raytheon responded to Automated's demand for arbitration with an extensive "Pre–Hearing Memorandum," which disclaimed liability on any of the theories advanced by Automated. Raytheon also interposed a small counterclaim for the amount of some unpaid expenses allegedly owed it by Automated. Finally, in a single sentence, Raytheon advised the arbitrators that it "d[id] not consent to the submis-

sion" of punitive damages issues to the arbitral panel. Ten days of hearings then began before a panel of three arbitrators, two of whom were selected by the parties (one each). During the course of the hearings, Automated introduced a substantial amount of evidence, including evidence which, it believed, supported the award of punitive damages. Raytheon introduced evidence as well and put on what appears to have been a generally comprehensive and spirited defense to Automated's various claims. Raytheon did not, however, argue the punitive damages issue to the arbitrators. For their part, prior to the issuance of the award, the arbitrators never said anything either way about Automated's claim for punitive damages or Raytheon's statement that it did not consent to the arbitration of the issue.

About a year later, in January 1988, the arbitrators issued an award, with the arbitrator appointed by Raytheon dissenting. Automated was awarded $408,000 in compensatory damages, $121,000 in attorneys' fees, $47,000 in expenses, and $250,000 in punitive damages.[1] The award contained no explanation for the outcome of the proceedings or for the precise dollar amounts the panel chose to award. The award did, however, make reference to the unexecuted 1982 agreement between Raytheon and Automated, rather than the 1978 agreement under which Automated had brought its claim.

Relying largely on this apparent error, Raytheon filed suit in federal court to vacate the award, alleging that it was facially invalid, inasmuch as it relied on an agreement that had never been in force. Raytheon also contended that the panel had not been empowered to award punitive damages. Meanwhile, counsel for Automated contacted the American Arbitration Association ("AAA") and requested it to instruct the panel to correct its error "on an expedited basis" by substituting the proper contract reference. Counsel may also have contacted the neutral arbitrator directly to

---

1. Raytheon received $8700 on its counterclaim.

inform him of the need for a change in the form of the award.[2]

As matters turned out, Automated's counsel need not have contacted the AAA at all, for the district judge himself corrected what he termed the arbitrators' "innocuous mistake" and amended the erroneous reference to the 1982 agreement to one to the 1978 agreement which had been the subject and focus of the arbitral proceedings. Additionally, relying on general federal arbitration policy, he determined that the agreement's arbitration clause was sufficiently open-ended to encompass an award of punitive damages and gave no effect to Raytheon's last minute statement declining to "consent" to arbitration of the punitive damage claims. He confirmed the award.

## II.

■ We begin our analysis with brief discussions of two arguments raised, almost summarily, by Raytheon. Raytheon first contends that the arbitral award should be vacated because the arbitrators did not make any "findings of fact" in support of their award. This position is plainly incorrect, for it has long been settled that arbitrators are not required to make formal "findings of fact" to accompany the awards they issue. Indeed, "[a]rbitrators have no obligation ... to give their reasons for an award at all." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). *See also Koch Oil, S.A. v. Transocean Gulf Oil Co.*, 751 F.2d 551, 554 (2d Cir.1985) (settled that "arbitrators may render a lump sum award without disclosing their rationale for it"); *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 312 (7th Cir.1981) (same). It is, accordingly, manifest that we cannot set aside an arbitration award merely because the arbitrators chose not to provide the parties with the reasons for their decision.

■ Raytheon's second contention is that the arbitrators somehow deprived it of its Fifth Amendment right to due process by "failing to tell Raytheon that [they] intended to reach the issue of punitive damages," thus denying Raytheon an opportunity to argue the merits of the punitive damages claims during the hearing. This argument suffers on two fronts: it fails to place the relevant events in their proper perspective, and it is not supported by the precedent Raytheon cites.

Turning first to the relevant events, it is undisputed that Raytheon waited until the day arbitral hearings were to commence before it submitted its perfunctory statement regarding the arbitrability of punitive damages claims. It did not ask the panel to rule on the question immediately, nor, when the panel remained mute on this aspect of Raytheon's submission, did it seek to continue the hearings. (Given the fact that Raytheon buried its one-sentence treatment of the issue in a 34–page memorandum, it is not at all surprising that the arbitrators did not comment on the matter before issuing the award.) Moreover, Raytheon does not contend that it was prevented from introducing evidence relevant to, or arguing the merits of, punitive damages issues. Nor did the arbitrators take any action or make any affirmative statements which could have led Raytheon to believe that the issue of the arbitrability of punitive damages claims had been decided in its favor. Rather, it appears that Raytheon simply made a judgment that the single sentence in the memorandum would be sufficient to carry the legal issue or that the arbitrators' silence somehow signaled their agreement with its legal position.[3] Al-

---

**2.** Raytheon does not challenge these actions in this appeal, and they appear to have had no effect whatever on the course of the litigation. We do not address in this decision either the propriety or the implications of *ex parte* contact with arbitrators.

**3.** We note that Raytheon does not argue that by arbitrating the merits it would have waived its right to assert that the award of punitive damages was beyond the power of the arbitrators, nor are we aware of any authority that would support any such claim. *Cf. Jones Dairy Farm v. Local No. P–1236, United Food and Commercial Workers Int'l Union, AFL–CIO*, 760 F.2d 173, 175 (7th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 136, 88 L.Ed.2d 112 (1985) (objection

though the consequences of this erroneous surmise were, from Raytheon's perspective, unfortunate, we are unable to see how the arbitrators' behavior denied Raytheon of its constitutional right to due process. *See Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 268 (7th Cir.1988) (no due process violation where arbitrators gave party, who later objected to a procedural ruling of the arbitration panel, "ample opportunity to present favorable ... evidence," although the party "apparently neglected to do" so).

In addition, we find Raytheon's position unsupported by the cases upon which it relies. While it is true that in one of the cases the Fifth Circuit did vacate an arbitral award on the ground that a party to the arbitration had failed to receive a " 'fundamentally fair hearing,' " *Totem Marine Tug & Barge, Inc. v. North American Towing*, 607 F.2d 649, 651 (5th Cir. 1979) (quoting *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, UAW*, 500 F.2d 921, 923 (2d Cir.1974)), the *Totem Marine* situation is far different from that before us here. In the Fifth Circuit's case, the arbitrators had awarded damages three times as large as those requested by the claimant and had grounded their award largely in a theory of loss not even mentioned by the claimant in its submission. 607 F.2d at 651. Quite reasonably we think, the *Totem Marine* court concluded that a party's right to a fair hearing had been violated by a course of events in which the adverse party received no notice of, and had no possible opportunity to respond to, a theory of loss which, in the arbitrators view, justified a six-figure award. Here, as discussed above, Raytheon did have notice that Automated intended to seek punitive damages (clear enough, in fact, for Raytheon to respond to the issue—if only briefly—in its Pre-Hearing Memorandum); and it had the entire hearing in which to respond to Automated's claim. Therefore, we reject Raytheon's due process argument and conclude that the arbitrators did not fail to afford it a "full opportunity to present [its] case[ ]."

waived when party "voluntarily and unreserved-

*Hoteles Condado Beach v. Union de Tronquistas*, 763 F.2d 34, 38 (1st Cir.1985).

### III.

█ We come, then, to the central issue in the case. We must determine whether the arbitration clause in the contract before us empowered the arbitral panel to award punitive damages. Since the arbitration clause under consideration was part of a contract which affected interstate commerce, Automated is correct in its contention that the broad policies of the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, govern our analysis. This statute expresses the strong federal policy in favor of arbitration. The Supreme Court has spoken generally to the effect that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Constr.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983). While hortatory statements such as this are helpful in framing our discussion, our conclusion that the arbitrators did not exceed their powers in awarding punitive damages in this case is predicated upon substantially more rigorous analysis.

We turn initially to the text of the Raytheon–Automated arbitration clause, noting two important aspects of the language the parties chose. First, the arbitration clause is neither limited in its scope nor optional in its application; rather, it states unequivocally that *"[a]ll disputes"* arising from the contract *"shall be* settled" through arbitration (emphasis added). Second, it explicitly requires arbitration to be conducted under the rules of the AAA. Among these rules, with which one must expect a sophisticated commercial party like Raytheon to be intimately familiar, is Rule 42, which empowers AAA arbitrators to "grant any remedy or relief which is just and equitable and within the terms of the agreement of the

ly submits an issue to arbitration").

parties." [4] Combining these two observations, the specific question we must answer may be best phrased as whether, when Automated and Raytheon agreed to "settle" through arbitration "all disputes" arising under their contract and to authorize the arbitrator to grant any just and equitable remedy or relief, they agreed to include "within the terms of [their] agreement" the power to award punitive damages.

Were we to confine our analysis to the plain language of the arbitration clause, we would have little trouble concluding that a contract clause which bound the parties to "settle" "all disputes" through arbitration conducted according to rules which allow any form of "just and equitable" "remedy of relief" was sufficiently broad to encompass the award of punitive damages. Inasmuch as agreements to arbitrate are "generously construed," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) ("*Mitsubishi Motors*"), it would seem sensible to interpret the "all disputes" and "any remedy or relief" phrases to indicate, at a minimum, an intention to resolve through arbitration any dispute that would otherwise be settled in a court, and to allow the chosen dispute resolvers to award the same varieties and forms of damages or relief as a court would be empowered to award. Since courts are empowered to award punitive damages with respect to certain types of claims, the Raytheon–Automated arbitrators would be equally empowered. Before reaching a conclusion, however, on the issue before us, we must consider more than the bare language of the Automated–Raytheon contract. We must also consider both the cases on which Raytheon's position rests and the various approaches to the arbitrability of punitive damages claims adopted by other courts.

Relying on two labor arbitration cases (one of them our own), Raytheon argues that arbitrators must have explicit contractual authorization before they can award punitive damages. *See Bacardi Corp. v. Congreso de Uniones Industriales de Puerto Rico,* 692 F.2d 210, 214 (1st Cir. 1982) ("[t]he arbitrator's opinion cites no provision of the [collective bargaining] contract authorizing punitive damages"); *Miller Brewing Co. v. Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1164 (7th Cir.1984) ("arbitrators are rarely thought authorized to award punitive damages"), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985). However, the concerns which may warrant such a rule in the labor arbitration field are not present in the commercial arbitration context. Labor arbitration is an integral aspect of the entire collective bargaining process; it is intended to be a part of a continuing and ameliorating enterprise between parties who maintain an ongoing working relationship. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 580–81, 80 S.Ct. 1347, 1351–52, 4 L.Ed.2d 1409; *Communications Workers of America v. Western Electric Co.,* 860 F.2d 1137, 1141 (1st Cir.1988); St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel and Its Progeny,* 75 Mich.L.Rev. 1137, 1140 (1977) (labor arbitrator is part of the collective bargaining process, serves to "strik[e] whatever supplementary bargain is necessary" to give effect to the parties' agreement). Punitive actions are disfavored; the award of punitive damages in the midst of a steady stream of arbitrations between a company and its unions might well undercut both sides' confidence in the arbitration process and decrease their commitment to this essential aspect of "industrial self-government." *Warrior & Gulf,* 363 U.S. at 580, 80 S.Ct. at 1351.

Commercial arbitration, by contrast and as this case itself exemplifies, is normally considered a one-shot endeavor, in which the parties have chosen arbitration not as a means of ongoing dispute resolution, but as

---

**4.** The Rule quoted in the text is, under the current version of the AAA Rules, Rule 43. *See Domke on Commercial Arbitration,* (Wilner revd. ed. 1988), App. VII at 53. For purposes of this opinion, we refer to the rule as Rule 42, adopting the designation in effect at the time the parties' agreement was in force and at the time of the arbitration.

a "simpl[e], informal[ ], and expeditio[us]"
method of resolving a particular dispute.
*Mitsubishi Motors,* 473 U.S. at 628, 105
S.Ct. at 3354. It provides a quicker and
less costly vehicle for obtaining the relief
which might otherwise require extensive
and debilitating litigation. Given the pro-
found difference between the two types of
arbitration, the *Bacardi* and *Miller Brew-
ing* cases are of little relevance to our
decision here and we must, therefore, focus
our attention on the cases addressing the
propriety of punitive damages awards in
commercial arbitration settings.[5]

Commercial arbitration cases seem to
have taken three different approaches to
the punitive damages question. Several
jurisdictions, following the lead of the New
York Court of Appeals in a 1976 decision,
have determined, as a matter of the law of
particular states, that arbitrators can never
award punitive damages. These decisions
are predicated on the theory that punitive
damages are a form of sanction reserved to
the State alone, one which can never be
applied—even with consent—in purely pri-
vate disputes. *Garrity v. Lyle Stuart,
Inc.,* 40 N.Y.2d 354, 386 N.Y.S.2d 831, 832–
33, 353 N.E.2d 793 (1976). *See also
Anderson v. Nichols,* 359 S.E.2d 117, 121,
n. 1 (W.Va.1987); *Shaw v. Kuhnel & Asso-
ciates, Inc.,* 102 N.M. 607, 698 P.2d 880,
882 (1985). The *Garrity* rule has been
sharply criticized, *see Belko v. AVX Corp.,*
204 Cal.App.3d 894, 251 Cal.Rptr. 557, 563
(1988); Stipanowich, *Punitive Damages in
Arbitration, Garrity v. Lyle Stuart, Inc.
Reconsidered,* 66 B.U.L.Rev. 953, 959
(1986) (*Garrity* is "an anomaly, frustrating
the goals of fairness and finality that are
the essence of arbitration and undermining
the valuable role that punitive damages
play in deterring fraudulent or malicious

conduct"), and we decline to adopt such a
restrictive approach to arbitration here.

Similarly, we reject a position recently
adopted by an intermediate state court in
California, under which punitive damages
could be awarded by a commercial arbitra-
tor only if the parties' agreement to arbi-
trate specifically provided for the possibili-
ty of punitive damages awards. *Belko,* 251
Cal.Rptr. at 562. (This second approach to
the question mirrors that urged on us, by
reference to the labor arbitration cases dis-
cussed *supra* at 11–12, by Raytheon.) We
note first that the *Belko* decision appears
to be at odds with an earlier California
appellate case, *Baker v. Sadick,* 162 Cal.
App.3d 618, 625–26, 208 Cal.Rptr. 676, 681
(Cal.App.1984), in which the court affirmed
the award of punitive damages pursuant to
a standard form arbitration agreement,
given that the parties did not have a "plain
and clear" mutual understanding that puni-
tive damages would *not* be awarded. More
important, we find the *Belko* approach to
be inconsistent with federal arbitration pol-
icy and contrary to the rule adopted by the
run of federal courts to have considered
the punitive damages question.

Most prominent among the federal cases
is the Eleventh Circuit's *Bonar* decision, in
which the court, adopting the third ap-
proach to the arbitrability of punitive dam-
ages, upheld a punitive damages award
although the arbitration agreement con-
tained no express mention of such relief.
*Bonar* held that the parties' incorporation
of the AAA Rules, including Rule 42, "au-
thorized the arbitrators to award punitive
damages." 835 F.2d at 1386–87. The
court further ruled that a choice of law
provision in the contract, which specified
the law of a forum which did not allow
punitive damages to be awarded in arbitral

---

5. In looking to the caselaw on this subject, we
adopt the view, expressed by a number of other
courts, that the contract's choice-of-law provi-
sion does not require us to determine the puni-
tive damages question by looking to the law of
the chosen forum (in this case, California).
Rather, we, like they, look to federal common
law for our answer. We agree with these other
courts that both the parties' adoption of the AAA
rules (particularly Rule 42, *supra*), *Bonar v.
Dean Witter Reynolds, Inc.,* 835 F.2d 1378, 1386–
87 (11th Cir.1988) ("*Bonar*"); *Willoughby Roof-
ing & Supply Co., Inc. v. Kajima International,*

*Inc.,* 598 F.Supp. 353, 358 & n. 11 (N.D.Ala.1984)
("*Willoughby Roofing*"), and the general canon
that federal law governs the construction of
arbitration agreements respecting interstate
commerce, *Singer v. E.F. Hutton & Co., Inc.,* 699
F.Supp. 276, 278–79 (S.D.Fla.1988) ("*Singer*");
*Willis v. Shearson/American Express, Inc.,* 569
F.Supp. 821, 824 (M.D.N.C.1983) ("*Willis*"), sup-
port this conclusion.

*Volt Information Sciences, Inc. v. Board of
Trustees of the Leland Standford Junior Univ.,*
— U.S. —, 109 S.Ct. 1248, 103 L.Ed.2d 488
(1989), does not alter our conclusion. There, the

proceedings (in that case, New York, *see* discussion *supra* at 13), did not limit the force of AAA Rule 42 or render punitive damages no longer " 'within the scope of the agreement of the parties.' " *Id.* at 1387 (quoting AAA Rule 42). In reaching this result, the Eleventh Circuit adopted a rule favoring the arbitrability of punitive damage claims. A similar view has been taken by all federal district courts which have considered the issue, including the district court in *Bonar. See Singer,* 699 F.Supp. at 278–79; *Ehrich v. A.G. Edwards & Sons, Inc.,* 675 F.Supp. 559, 565 (D.S.D.1987) (allowing arbitrators to award punitive damages is consistent with "the strong federal policy in favor of upholding an arbitrator's ability to fashion appropriate remedies"); *Willoughby Roofing,* 598 F.Supp. at 358 & n. 11, *aff'd,* 776 F.2d 269 (11th Cir.1985); *Willis,* 569 F.Supp. at 824 (no "reason persuasive enough to justify prohibiting arbitrators from resolving issues of punitive damages submitted by the parties").

Raytheon has cited no federal case, and stated at oral argument that it was not aware of any federal case, that reaches a contrary result in the commercial arbitration context. We have been similarly unable to find a federal decision which supports Raytheon's position and can see no reasoned justification for departing from the rule laid down by our colleagues in other parts of the nation. Like them, we agree that punitive damages can serve as an effective deterrent to malicious or fraudulent conduct. Where such conduct could give rise to punitive damages if proved to a court, there is no compelling reason to prohibit a party which proves the same conduct to a panel of arbitrators from recovering the same damages. Certainly, the fact that the parties agreed to resolve their dispute through an expedited and less formal procedure does not mean that they

should be required to surrender a legitimate claim to damages. Parties that do wish arbitration provisions to exclude punitive damages claims are free to draft agreements that do so explicitly. In this case, no such exclusion from the general language of the arbitration clause exists. Accordingly, we conclude that the district correctly ruled that the arbitrators were authorized to award punitive damages against Raytheon.

*Conclusion*

The decision of the district court is AFFIRMED

Court held that application of state procedural rules anent arbitration was not preempted by the Federal Arbitration Act even though those rules provide for staying arbitration in some instances. *Id.* at ——, 109 S.Ct. at 1251. In *Volt,* however, the scope of the arbitration agreement was not disputed. By contrast, the issue in the case at bar focuses precisely on the scope of the arbitration agreement, *viz.,* whether it encompasses punitive damages. Hence, we are obliged

to apply the "settled *federal* rule" that "due regard must be given to the *federal* policy favoring arbitration, and ambiguities as in favor of arbitration." *Id.* at ——, 109 S.Ct. at 1253–54 (emphasis added). *See Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Finally, we note that in the case before us the appellant conceded that federal law controlled.