**Ahmad BARAVATI, Plaintiff,**

v.

**JOSEPHTHAL LYON & ROSS INC. and Peter Sheib, Defendants.**

93 C 338.

United States District Court, N.D. Illinois, E.D.

Oct. 4, 1993.

Mark Steven Kende, Judson H. Miner, Davis, Miner, Barnhill and Galland, P.C., Chicago, IL, for plaintiff.

M. Jayne Rizzo, Lisa Jane Barkin, Kelley, Drye & Warren, Chicago, IL, for defendants.

### *MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.

Plaintiff Ahmad Baravati ("Baravati") originally brought an arbitration claim against Defendants Josephthal, Lyon & Ross Inc. ("JLR") and Peter Scheib ("Scheib") (collectively "the Defendants") alleging various causes of action including retaliatory discharge and defamation as a result of a dispute between himself and his employer regarding certain securities dealings. The arbitrator awarded Baravati both compensatory and punitive damages after finding that Defendants had defamed him by intentionally and falsely accusing him of taking firm property on his termination form, commonly known in the securities field as his U–5 form. Baravati now seeks to confirm this award pursuant to 28 U.S.C. § 1332, the Federal Arbitration Act ("FAA"), and 9 U.S.C. § 9. Plaintiff also seeks Rule 11 sanctions against Defendants for their failure to cite to applicable adverse authority in their earlier motion to dismiss these proceedings for failure to join an indispensable party. For the following reasons, we confirm the award and decline to impose sanctions.

### *BACKGROUND*

In April 1989, Plaintiff Ahmad Baravati began work as an account executive in the Chicago office of Rosenkrantz, Lyon & Ross, currently known as Josephthal Lyon & Ross Inc. ("JLR"), a New York-based securities dealer and a member of the National Association of Securities Dealers ("NASD"). During January 1990, he was responsible for underwriting the public stock offering of Roberts Pharmaceutical Co. ("RPC"). In conjunction with this venture, Baravati sought indications of interest to purchase RPC stock from his clients. The initial offering price of the stock was $6.00 per share.

Over the course of that month, the stock market experienced declines. A number of Baravati's clients requested cancellation of their indications of interest. Baravati notified Howard Jacobson ("Jacobson"), the Chicago office manager and his immediate supervisor, of this situation. Jacobson stated he would take care of the situation. However, Baravati subsequently discovered that the names of these clients still remained on the purchase list for the stock. He brought this matter to Jacobson's attention a second time. Jacobson stated he would contact the New York office and have the orders canceled.

Several days later Baravati learned that the purchase orders for his clients had not been canceled. Baravati contacted Averell Satloff ("Satloff"), JLR's Managing Director and a member of the Board of Directors, to discuss the situation. Satloff recommended that Baravati "cross" the stock and find al-

ternate buyers. Additionally, Satloff recommended that Baravati sell the stock at the original asking price of $6.00 per share, although current market value was $5.00 per share.

In early February 1990, Baravati consulted an attorney from the Chicago office of the Securities and Exchange Commission ("SEC") about this situation. On February 15, 1990, JLR withheld Baravati's paycheck without explanation. Baravati contacted Dan Purjes ("Purjes"), Chairman and Chief Executive of JLR, about the paycheck. Purjes informed him to discuss the matter with Jacobson.

On February 22, 1990, the SEC contacted Jacobson. Jacobson questioned Baravati regarding the SEC inquiry. Later that day, JLR terminated Baravati. Baravati's second paycheck was subsequently withheld.

Jacobson submitted a Termination Request, dated February 14, 1990, to JLR's New York office. Termination was recommended for failure to follow company policy. Baravati had not been informed of these reasons for termination.

On February 26, 1990, Peter Scheib, company vice-president and a member of the JLR Board of Directors, completed, in accord with NASD regulations, a Uniform Termination Notice or Securities Industry Registration form ("U-5") on Baravati. On this form, Scheib indicated that Baravati had been terminated and was under internal review for "wrongful taking of firm property in the amount of $7,650.25." Furthermore, on March 9, 1990, JLR legal counsel wrote the Illinois Department of Labor, giving notification of Baravati's termination for cause on February 14, 1990. In this letter, JLR stated that Baravati owed the firm approximately $4900 for unauthorized trades.

On March 12, 1990, the NASD Surveillance Department notified Baravati that a review of his termination was in progress. One month later, a supervisor of examiners for the NASD wrote Baravati that the investigation had been completed and the matter was filed without action. None of the allegations warranted further NASD intervention.

Baravati filed an arbitration claim with NASD on February 6, 1991. In his complaint, Baravati alleged fifteen claims against JLR and its personnel, Purjes, Scheib, Satloff and Jacobson. These included retaliatory discharge, defamation, intentional interference with business expectancy, emotional distress, breach of implied covenant, lost commissions and quasi-contract. Baravati requested an award of $14,500,000 for actual, compensatory, and punitive damages, attorney fees and interest.

An NASD arbitration panel heard the claim in Chicago, Illinois. Both parties presented testimony in hearings that were held between March 1992 and October 1992. After consideration of the pleadings, testimony, hearing evidence, and post hearing submissions, the arbitrators found in Baravati's favor. The arbitrators made the following determinations:

1) JLR, Scheib, and Jacobson were jointly and severally liable for a sum of $60,000 in satisfaction of all of Baravati's claims;

2) JLR, Scheib, and Jacobson were jointly and severally liable for $120,000 in punitive damages for the severe harm caused by the unconscionable language contained in Baravati's U-5 form;

3) Claims against Purjes and Satloff were dismissed with prejudice; and

4) JLR was to file an amended U-5 form.

On January 19, 1993, Baravati filed a motion for confirmation of the award in District Court for the Northern District of Illinois. The following day, Defendants filed a motion for denial of the arbitration award in District Court for the Southern District of New York. On January 27, 1993, defendants' claim was dismissed without prejudice.

On March 18, 1993, defendants filed a motion to dismiss Baravati's complaint for failure to join an indispensable party or, in the alternative, to stay this proceeding pursuant to the Colorado River Doctrine. We held that Jacobson, found to be a joint and severally liable tort-feasor by the arbitrators, was not an indispensable party to Baravati's claim. Defendants' motion was denied.

On June 16, 1993, Baravati filed motions to confirm the arbitration award and impose

Rule 11 sanctions against Defendants. Baravati alleged Defendants' motion to dismiss was unwarranted under existing law. He requests reasonable expenses incurred as a result of this prolonged litigation.

## DISCUSSION

■ When addressing the validity of an arbitration award, we begin our analysis with the basic premise that judicial review of arbitration awards is limited and that courts should give arbitrator's awards considerable deference. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Only if the arbitrator's decision fails to "draw its essence from the collective bargaining agreement" will a court refuse to enforce the decision. *Id.* The Seventh Circuit has held that an arbitration award "draws its essence" from the contract so along as that award is based on the arbitrator's interpretation of the contract—even if the court is convinced that interpretation is unsound or based on factual or legal error. *Ethyl Corp. v. United Steel Workers of America*, 768 F.2d 180, 184 (7th Cir.1985).

■ The Federal Arbitration Act establishes a federal policy favoring arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310 (7th Cir.1981). In keeping with this policy, federal courts "do not review the soundness of arbitration awards." *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 935 F.2d 1501, 1504–05 (7th Cir.1991). Judicial review of arbitration awards "is restricted to further the objective of arbitration, which is to enable parties to resolve disputes promptly and inexpensively, without resort to litigation...." *Moseley, Hallgarten, Estabrook & Weeden Inc. v. Ellis*, 849 F.2d 264, 272 (7th Cir.1988). Recently, the Seventh Circuit reiterated this limited scope of review and the policy which it reflects:

> Contracting parties who agree to submit disputes to an arbitrator for final decision have chosen to bypass the normal litigation process. If parties cannot rely on the arbitrator's decision—if a court may over-

rule that decision because it perceives factual or legal error in the decision—the parties have lost the benefit of their bargain. Arbitration, which is intended to avoid litigation, would instead become merely the starting point of litigation.

*Carpenter Local No. 1027, Mill–Cabinet–Indus. Div. v. Lee Lumber and Building Material Corporation*, 2 F.3d 796 (7th Cir.1993).

Defendants oppose confirmation of the award contending that the decision is in manifest disregard of the law. Specifically, Defendants claim that the U–5 form, containing Defendants' reasons for Baravati's discharge, was absolutely privileged. As such, the statements contained could not be defamatory. Further, Defendants oppose the award of punitive damages, contending that such an award falls beyond the scope of the arbitrators' powers.

### The Defamation Finding

■ Not only are we aware of the public policy issues which support judicial deference to the arbitrator's decision, we are also cognizant that the arbitrators in this case presided over days of testimony and examined the evidence at length. As the triers of fact, we afford the arbitrators deference to the extent that their decision is supported by the record before us.

■ Defendants assert that the arbitrators' finding that Defendants defamed Baravati is flawed because the U–5 form which was the vehicle for the defamation is a document which is absolutely privileged. When absolute privilege attaches, there is no cause of action against the person making the statement, even when such a statement is made with malice. *Starnes v. International Harvester, Co.*, 141 Ill.App.3d 652, 96 Ill.Dec. 26, 27, 490 N.E.2d 1062, 1063 (1986). On the other hand, qualified privilege provides no such immunity for statements made with malice. *Id.* at 27, 490 N.E.2d at 1063.

The Second Circuit addressed the issue of defamation in relation to a U–5 form in New York Stock Exchange Arbitration between *Fahnestock & Co. v. Waltman*, 935 F.2d 512 (2nd Cir.1991). Under remarkably similar facts, the plaintiff in *Fahnestock,* was a stock

broker who alleged defamation against his former employer for statements made on his U–5 form. *Id.* at 514. After review, the arbitration panel awarded plaintiff compensatory and punitive damages for wrongful discharge and defamation, as well as legal fees. *Id.* On appeal, the employer contended that the U–5 form, filed as directed by law, was subject to absolute privilege. *Id.* at 515. The Second Circuit held that the U–5 form was protected only by qualified privilege. *Id.* at 516. Although the Second Circuit applied New York state law, the similarities in the court's findings parallel Illinois state law on defamation.

In Illinois, the question of whether a defamatory statement is protected by absolute or qualified privilege is a matter of law determined by the court. *Spencer v. Community Hospital of Evanston,* 87 Ill.App.3d 214, 42 Ill.Dec. 272, 277, 408 N.E.2d 981, 986 (1980). Statements made before a quasi-judicial proceeding are absolutely privileged. *Richardson v. Dunbar,* 95 Ill.App.3d 254, 50 Ill.Dec. 756, 758, 419 N.E.2d 1205, 1207 (1981). The determination of whether a body is quasi-judicial depends upon the powers and duties of the body conducting the proceedings and the nature of the proceedings themselves. *Id.* at 759, 419 N.E.2d at 1208.

Traditionally, judicial functions involve the power to determine legal rights and effect the status of those who appear before the adjudicating body. *Parker v. Kirkland,* 298 Ill.App. 340, 18 N.E.2d 709, 712 (1939). More recently, six powers have been identified to distinguish quasi-judicial bodies from those merely performing an administrative function. *Thomas v. Petrulis,* 125 Ill.App.3d 415, 80 Ill.Dec. 713, 716, 465 N.E.2d 1059, 1062 (1984) (citing with approval *Parker v. Holbrook,* 647 S.W.2d 692, 695 (Tex.App. 1982)). These include:

(1) [t]he power to exercise judgment and discretion; (2) the power to hear and determine or to ascertain facts and decide; (3) the power to make binding orders and judgments (4) the power to affect the personal or property rights of private persons; (5) the power to examine witnesses, and to hear the litigation issues on a hearing; and

(6) the power to enforce decisions and impose penalties.

*Id.* 80 Ill.Dec. at 716, 465 N.E.2d at 1062. While all of these powers need not be possessed by the body to be considered quasi-judicial in nature, the greater the number of powers present, the more likely the body is quasi-judicial. *Id.* at 716, 465 N.E.2d at 1062. Whether the U–5 is absolutely or qualifiedly privileged therefore depends upon whether it is used in an independent quasi-judicial or administrative function.

The U–5 is a mandatory form that employers fill out upon termination of an employee. It contains specific questions relating to the nature and circumstances of the employee's termination. When completed and submitted to NASD, the U–5 becomes part of a large informational base that is readily accessible to a wide range of NASD personnel. This clearinghouse of employment histories provides employers important information regarding the credentials of potential employees.

In this capacity, there is no doubt that the NASD informational base serves an important public function. However, this function is purely administrative, providing a centralized compilation of relevant employment information to a wide range of NASD personnel. The U–5 clearinghouse, although a recognized organizational subsidiary, possesses none of the six delineated powers attributed to quasi-judicial bodies.

Moreover, in this capacity, the U–5 form plays no independent role in formalized NASD quasi-judicial functions, such as arbitration. In such cases, the U–5 may trigger additional investigation, resulting in authorized adjudicatory settlements. However, the presence of unsatisfactory information on the U–5 form itself results in no direct consequence to the former employee. Furthermore, information contained in the U–5 is evaluated and subject to amendment through subsequent investigation.

For example, in the case at bar, Baravati's U–5 was investigated by the Surveillance Department of NASD. This investigation recommended that Defendants' allegation against Baravati be filed without action. Similarly, the arbitration panel, after its own

review of the circumstances regarding Baravati's termination, found the allegations unfounded. As part of its arbitration award, the panel ordered that the U-5 be amended to exclude the defamatory statements.

Such levels of additional review of the U-5 suggest that the form, while useful in employment decisions, carries little independent weight in NASD determinations. This lack of independent status, as well as the wide accessibility of the contents of the U-5, fails to support a finding of absolute privilege.

After examining the record, we conclude that the U-5 form, as part of a larger informational data base readily accessible to NASD personnel and potential employers, plays an administrative role in organizational functioning. At best, qualified privilege attaches to the form. Additionally, we defer to the fact-finder's conclusion that defamation occurred and that damages resulted which entitle Baravati to relief.

### Punitive Damages

■ Defendants also contend that punitive damages cannot be awarded to Baravati. Pursuant to 9 U.S.C. § 10(d), Defendants request this court to vacate the arbitration award alleging that the arbitrators exceeded their powers by granting punitive damages. 9 U.S.C. § 10(d). Although we are mindful of our deferential role in reviewing arbitration awards, we are also aware that "for a court to enforce an award that clearly is beyond the arbitrator's power denies the parties of the benefit of their bargain just as surely as overturning an award because the court disagrees with the decision's legal or factual basis." *Lee Lumber* 2 F.3d at 798.

■ In *Moses H. Cone Memorial Hospital v. Mercury Const. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), the Supreme Court ruled that federal common law, not state law, governs the scope and extent of arbitrability in agreements subject to the Federal Arbitration Act. Three federal appellate circuits have held that punitive damages may be awarded in NASD arbitration settlements. *Lee v. Chica,* 983 F.2d 883 (8th Cir.1993); *Raytheon Co. v. Automated Business Systems, Inc.,* 882 F.2d 6 (1st Cir. 1989); *Bonar v. Dean Witter Reynolds, Inc.,* 835 F.2d 1378 (11th Cir.1988). Although the Seventh Circuit has not directly addressed the issue, this circuit has unequivocally supported the upholding of arbitration awards unless the award is vacated on grounds specified in 9 U.S.C. § 10. *Moseley* 849 F.2d at 272.

The arbitration agreement to which the parties have contracted contains no express choice of law provision. The agreement further states that "the parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement." The agreement does not specifically exclude the award of punitive damages. Nor does the agreement restrict in any way the type of award which can be granted. In fact, the plural which has been added to the word "award" suggests the possibility of a broad range of remedies.

In light of the federal substantive law precedent which allows for punitive damages to be awarded, coupled with the language of the agreement itself, which contemplates a broad interpretation of remedies, we find that punitive damages can be awarded in this case.[1] We further defer to the fact-finding role of the arbitration panel which held that unconscionable language in the U-5 form and the actions of the Defendants required the awarding of punitive damages in this case.

■ Furthermore, both Plaintiff and Defendants agreed to submit to the NASD arbitration settlement. In the absence of an express choice of law provision, the FAA prevails. *Volt Information Sciences, Inc. v. Board of Trustees,* 489 U.S. 468, 477, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488. State law may be applied in arbitration matters, subject to preemption, only to the extent that it actually conflicts with federal law. *Id.* Here, federal substantive law, not any state law provision, guides the court's decision as

1. The Court is fully aware that the Second Circuit case of *Fahnestock* has been cited as support in our holding that the U-5 form is not absolutely privileged and that *Fahnestock* further held that punitive damages were not to be awarded in that case. However, the agreement in *Fahnestock* was governed by the law of the state of New York which explicitly prohibits the awarding of punitive damages in arbitration agreements.

to whether the punitive damages' award should be upheld. As we have already stated, three circuits have held that punitive damages may be awarded in NASD arbitration agreements.

Application of the Seventh Circuit's policy of favoring arbitration, together with the holdings from three federal appellate circuits, directs this court to uphold the arbitration panel's recommendation. We therefore confirm the arbitration panel's award of $120,000 in punitive damages to Plaintiff.

### Rule 11 Sanctions

After a careful review of the record, the Court declines to sanction the Defendants under Rule 11 for failure to support its motion to dismiss with certain adverse law. Although we find that the Defendants' arguments failed, we do not find that they were frivolous on either a legal or factual basis. *See Local 106 Service Employees International Union v. Homewood Memorial Gardens, Inc.,* 838 F.2d 958, 961 (7th Cir.1988).

### CONCLUSION

The Court confirms the arbitrators' award as to both the compensatory damages of $60,000 and the punitive damages of $120,-000. The Court denies Plaintiff's motion for Rule 11 sanctions.