Synchronics v. Realworld                CV-94-489-M   09/08/95

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Synchronics, Inc.,
     Plaintiff,

     v.                                        Civil No. 94-489-M

Realworld Corporation,
     Defendant.



O R D E R


     Synchronics, Inc. ("Synchronics") seeks confirmation of an
arbitration award under the Federal Arbitration Act.  See
9 U.S.C. § 9.  Realworld Corporation ("RWC") objects to
confirmation and asks the court to vacate the award, 9 U.S.C.
§ 10, arguing, inter alia, that the arbitrator both exceeded his
authority under the contract's arbitration clause and displayed a
manifest disregard for applicable law.  Having heard oral
argument and after carefully considering the parties' respective
positions, the court confirms the award of the arbitrator.


I.  BACKGROUND

     RWC manufactures computer software to perform accounting and
other business functions.  Synchronics, which is in the business
of distributing software products, signed a Value Added

Distributor Agreement (VADA) with RWC, dated December 30, 1988. Under the VADA, Synchronics was given the right to distribute RWC software, both standing alone (i.e. generic or off-the-shelf sales) and in conjunction with Synchronics's own software products.[1] During the spring of 1993, disputes arose between the parties that were eventually resolved in a written Settlement Agreement dated June 30, 1993.[2] The Settlement Agreement required: (1) Synchronics to pay RWC $250,000 to cover both past and future royalties on certain Synchronics software containing RWC software code; (2) RWC to continue to supply Synchronics under the VADA; (3) both parties to negotiate in good faith to reform the VADA as it related to Synchronics's distribution of RWC "generic" software; (4) Synchronics to make certain of its products available to RWC to determine if they contained "substantial copying" which would require either removal or further royalty payments; and finally, (5) that "any dispute that

---

[1] For example, Synchronics's most popular product, "Point of Sale," performs accounting and inventory functions for retail stores. The accounting functions of Point of Sale are performed by underlying RWC software.

[2] The disputes involved RWC complaints that Synchronics copied substantial amounts of RWC software code — more than allowed under the VADA — into Synchronics products.

2

may arise under" the agreement be submitted to an arbitrator for resolution.

In the fall of 1993, a dispute did arise under the Settlement Agreement. In a letter dated October 15, 1993, RWC informed Synchronics that a total recall and independent redevelopment of Synchronics software would be required if the companies were to continue their business relationship. Synchronics disagreed and declined to implement any recall or redevelopment program. Accordingly, RWC terminated the VADA on January 15, 1994. Following initial legal proceedings in Tennessee, in both state and federal court, in which Synchronics obtained temporary injunctive relief prohibiting RWC from terminating the VADA, the parties submitted their dispute to arbitration.

After hearing eight days of testimony and reviewing lengthy briefs, the arbitrator rendered a decision ("the award") on September 15, 1994. The award sets forth detailed findings of fact, citations to the record and exhibits, and also makes clear the arbitrator's view as to the credibility of the parties' respective witnesses. Among other things, the arbitrator found

that: (1) Synchronics substantially performed all of its obligations under the Settlement Agreement until RWC, acting in bad faith, cut off the good faith negotiations required by that Agreement; (2) "under a number of basic contract doctrines including detrimental reliance, [RWC was] barred from benefiting from the fruits of its bad faith performance, non-performance, and refusals to continue negotiations under the Settlement Agreement"; (3) the RWC "recall" letter of October 15, 1993, was particularly egregious in that, in violation of the Settlement Agreement, it required Synchronics to effectively recall and redevelop much of its product software; (4) the credibility of past RWC management and technical personnel, all produced by Synchronics, was more reliable than the "inflammatory evidence" presented by RWC; (5) Synchronics did not owe RWC royalties on so-called "replacement programs"[3]; and (6) after the Settlement Agreement was entered into, the parties reached an agreement which had the effect of carving out an exception to language in the Settlement Agreement regarding Synchronics's distribution of generic RWC software.

---

[3] The term "replacement program" refers to those portions of the Synchronics software code which mirror RWC code and exist solely to allow the companies' respective software products to operate together.

4

Based upon his findings, the arbitrator awarded the following relief: 1) the parties were required to perform all of their obligations under the Settlement Agreement and the VADA; 2) RWC was barred from terminating the VADA unless Synchronics failed to make payments due under the contract; 3) Synchronics was allowed to sell prepackaged "generic" RWC software only in limited circumstances; 4) RWC was ordered to retract allegations of "software piracy" it made against Synchronics in certain trade publications; 5) RWC was ordered to pay Synchronics $82,732 in actual damages and $100,000 in attorney's fees; and 6) the monetary award to Synchronics was offset by $6474.81 in damages which the arbitrator found Synchronics owed RWC.

RWC argues, inter alia, that the court should vacate the arbitration award because: 1) the award exceeded the scope of the arbitrator's authority; and 2) the arbitrator displayed a manifest disregard of the applicable law.

## II. STANDARD OF REVIEW

5

The court's review of arbitration awards is very limited.[4] See e.g. Bettencourt v. Boston Edison, 560 F.2d 1045, 1048 (1st Cir. 1977) (judicial review of arbitration awards is limited and narrow). Pursuant to 9 U.S.C. § 10, courts may vacate an arbitrator's decision in the following circumstances:

(1) Where the award was procured by fraud, or undue means;

(2) Where there was evident partiality or corruption in the arbitrators, or either of them;

---

[4] RWC argues that the New Hampshire choice of law provision in the Settlement Agreement requires the court to conduct its review pursuant to the standard established in N.H. RSA 542:8. That statute permits a reviewing court to overturn an arbitration award based upon "plain mistake." Id. New Hampshire law, however, does not govern. While in Volt Information Sciences v. Board of Trustees, 489 U.S. 468 (1989), the Supreme Court let stand a California Court's interpretation of a contractual choice-of-law provision as requiring application of the state's procedural arbitration rules, Id. at 476-77, several courts have since held that Volt does not stand for the proposition "that any time a choice-of-law provision is included in an arbitration agreement, state law rather than federal arbitration law must apply." Appalachian Regional Healthcare, Inc. v. Beyt, Rish, Robbins Group, 1992 WL 107014, *2 (6th Cir. (Ky.)(citing Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1062 (9th Cir. 1991); Painewebber Inc. v. Hartmann, 921 F.2d 507, 510 (3d. Cir. 1990); Ackerberg v. Johnson, 892 F.2d 1328, 1333-34 (8th Cir. 1989); Barbier v. Shearson Lehman Hutton, Inc., 752 F.2d 512, 518 (2d Cir. 1991)). The New Hampshire choice-of-law provision here appears to evidence only the parties' intent to abide by New Hampshire law as it relates to their substantive rights and duties. See Mastrobuono v. Shearson Lehman Hutton, Inc., 115 S.Ct. 1212 (1995) (the choice of law clause encompasses only "substantive principles that New York courts would apply"). Accordingly, the proper standard of review is that described in the Federal Arbitration Act.

>  (3)  Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; and
>
>  (4)  Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. §10(a).  The Court of Appeals for the First Circuit has also recognized two non-statutory bases upon which an arbitrator's award may be vacated: (1) cases, "usually involving labor arbitration, . . . where an award is contrary to the plain language of the collective bargaining agreement," and (2) cases where the arbitrator displays a "manifest disregard" of the applicable law.  Advest, Inc. v. McCarthy, 914 F.2d 6, 9 (1st Cir. 1990); Trustees of Lawrence Academy v. Merrill Lynch Pierce Fenner & Smith, Inc., 821 F.Supp. 59, 62 (D.N.H. 1993).

Despite these statutory and judicially recognized bases upon which an arbitrator's award may be vacated, a reviewing court's focus remains limited.  As the Supreme Court has said:

> [T]he parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract . . .  So, too, where it

7

> is contemplated that the arbitrator will
> determine remedies for contract violations
> that he finds, courts have no authority to
> disagree with his honest judgment in that
> respect . . . [A]s long as the arbitrator is
> even arguably construing or applying the
> contract and acting within the scope of his
> authority, that a court is convinced he
> committed a serious error does not suffice to
> overturn his decision.

United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38

(1987)(citations omitted). RWC's objection to confirmation of

the award must be considered in light of this limited scope of

review.


## III.  DISCUSSION

A.  RWC's "Scope of Authority" Argument

The arbitration clause contained in the Settlement Agreement

"is neither limited in its scope nor optional in its

application." Raytheon Co. v. Automated Business Sys., 882 F.2d

6, 9 (1st Cir. 1989). Instead, it broadly declares:

> In the event of any dispute that may arise
> under this settlement agreement, the parties
> agree that the dispute will be submitted to a
> mutually agreeable independent third party
> for determination and binding resolution. If
> the parties are unable to agree on an
> independent third party the dispute shall be
> submitted to the American Arbitration

8

Association ["AAA"] for binding arbitration
pursuant to its rules.

Settlement Agreement ¶ 9. RWC argues that the arbitrator exceeded his authority under that clause because he "expanded Synchronic's rights not only under the Settlement Agreement, but under the [VADA] agreement as well, even where the latter was not incorporated into, or implicated by the Settlement Agreement." Defendant's Opposition to Plaintiffs Application For Confirmation of Arbitration Award ("Def. Opp.") at 18. The court does not agree.

Although the arbitration clause is found in the Settlement Agreement, the terms of the VADA were also properly before the arbitrator. Federal policy directs courts to "construe arbitration clauses as broadly as possible." S.A. Mineracao da Trindade-Samitri v. Utah International, Inc., 745 F.2d 190, 194 (2d. Cir. 1984). Doubts concerning the scope of arbitration clauses "should be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583 (1960); see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 626 (1985)(agreements to arbitrate are generously construed). Here, not only did the

9

Settlement Agreement specifically reference and modify the terms of the VADA, it also required RWC "to continue in good faith and full force and effect the [VADA] . . . ." Settlement Agreement ¶ 8. Disputes involving good faith performance under the VADA thus necessarily "arise under" the Settlement Agreement because good faith performance of the VADA was required by the Settlement Agreement.[5] Since these disputes "arise under" the Settlement Agreement (as well as relate to the VADA), they are subject to the arbitration clause. Accordingly, the arbitrator did not exceed the scope of his charge when he considered the parties' duties under both the Settlement Agreement and the VADA.

Moreover, the arbitrator did not expand or curtail the rights of the parties under the respective agreements. Provided an arbitrator is "even arguably construing or applying the contract" an award will not be disturbed. <u>Misco, Inc.</u>, 484 U.S. at 38. Also, "[t]he factual findings of the arbitrator are not subject to judicial review." <u>Georgia-Pacific Corp. v. Local 27,</u>

---

[5] RWC has itself recognized the strong relationship between the VADA and Settlement Agreement, as evidenced in a letter from RWC president Murray Fish to Synchronics dated December 23, 1993. In that letter Mr. Fish pointed out, quite correctly, that "[t]he Settlement Agreement is a written modification of the [VADA]. Therefore a breach of the Settlement Agreement would also constitute a breach of the [VADA]."

<u>United Paperworkers Int'l Union</u>, 864 F.2d 940, 945 (1st Cir. 1988).

RWC next argues that the arbitrator exceeded his authority by substantially altering the rights of the parties under the respective agreements, because, contrary to the express terms of the VADA and Settlement Agreement, his award: (1) allows Synchronics indefinite, royalty free use of "replacement programs"; (2) expands the number of computer systems Synchronics may distribute with RWC software; and (3) without authority orders RWC to retract disparaging statements it made about Synchronics in trade publications. The court again disagrees.

RWC claims that the Settlement Agreement nowhere exempts replacement programs from royalty payment and licensing requirements. Def. Opp. at 19. The arbitrator found:

> [the replacement programs], while not a
> specific exception under the Settlement
> Agreement, are licensed under another
> distribution agreement between the parties.
> Even if these could be deemed to be "copied,"
> Realworld benefitted by the inclusion of such
> programs in Synchronics products as such
> programs ensured compatibility with extant
> Realworld programs in the hands of end users.
> Since such end users had already paid

11

> royalties to Realworld, no further royalties
> are due.

Findings of Fact and Award of Arbitration at p. 4.
The arbitrator also noted the "overwhelming evidence" provided by former RWC top executives — including the founder of the company — establishing that RWC had "encouraged the very imitation in coding techniques and procedures" which they now claim constitutes software piracy.  The arbitrator's determination that even though the replacement programs were not specifically excluded under the Settlement Agreement, the parties course of dealing, including the VADA, made it clear that the replacement programs were not subject to royalty payments, was both reasonable and supported by the record before him.  See Strathmore Paper v. United Paperworkers Intern.  900 F.2d 423, 428 (1st Cir. 1990) ("[A] contract may be found to incorporate past practice even though not mentioned.")

Next, RWC asserts that the arbitrator impermissibly expanded the "eligible computer systems" Synchronics was allowed to distribute beyond those authorized under the VADA, as modified by the Settlement Agreement.  Def. Opp. at 19.  The VADA and Settlement Agreement, when read together, permit Synchronics to

12

bundle RWC generic software with only two of its products.  The
arbitrator's award, however, appears, literally, to allow
Synchronics to distribute generic RWC software provided it is
sold with "other Synchronics products as part of a bona fide
bundled package."  Award at 5-6.  RWC thus reads the award as
expanding Synchronics's rights under the agreements because it
places no limitation on the Synchronics products which can be
bundled with RWC generic software.

RWC overstates the case.  Read properly, the arbitration
award does nothing more than restate the rights of the parties
under the VADA.  By inserting the words "bona fide bundled
package," the arbitrator effectively qualified the words "other
Synchronics products" to mean only those products which are
authorized under the VADA.  The award does not allow (nor does
Synchronics contend that it allows) Synchronics to bundle generic
RWC software with any products other than those enumerated in the
VADA.[6]

_____

[6]  Section 1.8.1 of the VADA authorizes Synchronics to
bundle RWC software only with "Synchronic's `Point of Sale'
product and/or `Retail or Serialized Inventory' product. . .."

13

RWC also maintains that the arbitrator exceeded the scope of his authority by ordering RWC to publicly retract allegations of software piracy it directed at Synchronics. Arbitrators are accorded considerable leeway in designing equitable relief, especially where, as here, "the arbitration clause imposes no limitations on choice of remedies." Advest, 914 F.2d at 11. The arbitration clause in the Settlement Agreement unambiguously requires the parties to arbitrate disputes pursuant to the rules of the American Arbitration Association ("AAA"), failing agreement on a third party. Among the AAA's rules is Rule 43, which provides:

> "The Arbitrator may grant <u>any remedy or relief that the Arbitrator deems just and equitable</u> and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract." (emphasis added)

The arbitrator's retraction order was permissible as a reasonable exercise of the broad authority conferred by Rule 43. See e.g. Raytheon, 882 F.2d at 9. That the precise equitable relief ordered was not specifically contemplated in advance by RWC does not mean that the retraction order fell outside the scope of the arbitrator's authority. See Id. at 10 (arbitrator's punitive damages award upheld, despite lack of explicit

14

contractual authorization for such, where arbitration clause empowered arbitrator to grant any "equitable" relief); <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 895 F.2d 195, 199 (4th Cir. 1990) ("Arbitrators enjoy broad equitable powers. They may grant whatever remedy is necessary to right the wrongs within their jurisdiction.). And of course, given the requirement that RWC act in good faith, an essential aspect of the Settlement Agreement, the arbitrator's retraction order would seem to fall comfortably within the scope of his authority to provide a remedy that effectively redressed RWC's bad faith attempt to injure and intimidate Synchronics through the trade journal media. In that sense, the equitable relief awarded — an order of retraction — falls within the scope of the parties' Settlement Agreement.

B.  <u>Manifest Disregard of the Law</u>

Speaking to the narrow circumstances under which an arbitrator's decision may be vacated based on a manifest disregard of the law, the Court of Appeals for this Circuit has said:

> the phrase `manifest disregard' . . . means
> that, to vacate an arbitration award, `there
> must be some showing in the record other than
> the result obtained, that the arbitrator knew
> the law and expressly disregarded it.'  In

15

> this context, then `disregard' implies that
> the arbitrators appreciated the existence of
> a governing legal rule but willfully decided
> not to apply it.

Advest, 914 F.2d at 10 (quoting O.R. Securities, Inc. v.

Professional Planning Assoc., Inc., 857 F.2d 742, 747 (11th Cir.

1988)).


Notwithstanding the difficulty of meeting such a high

standard, RWC makes the following contentions regarding the

arbitrator's application of relevant law: (1) he misconstrued and

failed to apply the decision in Computer Assocs. Int'l v. Altai,

Inc., 982 F.2d 693 (2d. Cir. 1992); and, (2) he "incorrectly

applied" New Hampshire law with respect to, inter alia, the

statute of frauds.


First, Altai is a Second Circuit decision.  Its usefulness

to the arbitrator in applying New Hampshire's substantive law was

a matter for the arbitrator to determine.  That the arbitrator

may have overlooked decisional law which he had no strict

obligation to follow is of little consequence under the "manifest

disregard" standard.  But even if it were controlling precedent,

Altai does not appear to be directly on point.  In Altai a

16

computer programmer who worked for the plaintiff later went to work for the defendant software company, bringing with him certain source codes he had developed for plaintiff. Id. at 700. The former employee, using plaintiff's source codes, proceeded to create a new program for the defendant. Plaintiff responded by filing, among other things, a copyright infringement claim against defendant. Defendant, in turn, unilaterally rewrote the allegedly offending software, excising those portions that impermissibly used plaintiff's source codes. In order to insure production of non-infringing software, defendant assigned eight programmers that knew nothing of plaintiff's source codes to develop the software, and in addition excluded plaintiff's former employee from the process (in what is commonly referred to as a "clean room" procedure).

The Altai court set forth a "three-step procedure . . . to determine whether the non-literal elements of two or more computer programs are substantially similar." Id. at 706. Applying that test to the facts, the court held, in part, that there was no infringement as to the rewritten ("clean room") software. The Altai court also extended copyright protection to

17

the non-literal elements (source codes) of computer programs.
Id. at 702.

The issue before the arbitrator in this case was more
discrete ⸺ involving the extent to which the VADA and Settlement
Agreement permitted Synchronics to use RWC's concededly
proprietary software code in order to facilitate operation of its
products with RWC's.  Altai describes a test useful in
determining the "scope of copyright protection," Id. at 703, but
that precise issue was not before the arbitrator in this case.
The arbitrator cannot be said to have "manifestly disregarded"
the law when he found that RWC effectively agreed to
Synchronics's limited use of its source code.

RWC fairs no better with its claims that the arbitrator
manifestly disregarded New Hampshire's statute of frauds, N.H.
Rev. Stat. Ann. ch. ("RSA") 506:2.  RWC maintains that the
arbitrator erred when he found that the parties had entered into
an oral agreement modifying the Settlement Agreement to permit
Synchronics to distribute generic RWC software to so-called
"medallion dealers."  RWC says that no such agreement was
reached, that such an agreement would be directly contrary to the

terms of the Settlement Agreement, and that enforcement of such an oral agreement would be violative of New Hampshire's Statute of Frauds.

New Hampshire has long recognized that detrimental reliance can provide an exception to the usual application of the statute of frauds. White v. Poole, 74 N.H. 71 (1906). The arbitrator specifically noted that his decision to enforce the oral agreement (which he found to exist as a factual matter) was based, at least in part, on Synchronics's reliance upon it. The oral contract was sufficiently evidenced by customer letters approved by both parties, and, based upon his own assessment of the evidence and resolution of disputed facts, the arbitrator could have reasonably concluded that an oral agreement was reached and was enforceable. Accordingly, the arbitrator did not manifestly disregard New Hampshire law with respect to the statute of frauds.

Additionally, RWC maintains that the arbitrator disregarded New Hampshire's law of contract interpretation. The New Hampshire Supreme Court has consistently held that contracts are to be construed to effectuate the intent of the parties at the

time of the agreement. See R. Zoppo Co. v. City of Dover, 124 N.H. 666, 671 (1984); Trombly v. Blue Cross/Blue Shield, 120 N.H. 764, 770 (1980). The intent of the parties is to be judged objectively, Logic Assocs v. Time Share Corp., 124 N.H. 565, 572 (1984), and the contract is to be given "a meaning that would be attached to it by a reasonable person." Kilroe v. Troast, 117 N.H. 598, 601 (1977). Furthermore, a court must "consider the situation of the parties at the time of their agreement and the object that was intended thereby, together with all of the provisions of their agreement taken as a whole." R. Zoppo Co., 124 N.H. at 671; (citations omitted).

First, RWC claims that the arbitrator expanded Synchronics's ability to distribute RWC's generic software with "any" Synchronics product rather than only Synchronics's "Point of Sale" or "Inventory Plus" products as described in the VADA. As mentioned above, RWC misreads the award. The award does not allow, nor does Synchronics contend that it allows, bundling of generic RWC software with any Synchronics product other than the two specifically referenced in the VADA.

20

RWC also contends that the arbitrator ignored the Settlement Agreement in finding that Synchronics was entitled to royalty-free use of non-corrected RWC software used in Synchronics's products after June 30, 1993. RWC again reads more into the award than is there. Simply stated, the award holds that Synchronics does not owe RWC additional royalties for the use of non-corrected software because Synchronics attempted to honor the Settlement Agreement while RWC acted in bad faith when it thwarted Synchronics's efforts to comply.

RWC's final assertion, that the arbitrator ignored the plain meaning of the Settlement Agreement in holding Synchronics did not have to pay royalties for use of the "replacement programs," also fails, as explained above.

## IV. CONCLUSION

The arbitration award comports with New Hampshire's law of contract construction and validly determines the intent of the parties at the time they signed the Settlement Agreement. The court has reviewed RWC's remaining arguments and finds them to be without merit. For the reasons set forth above, the award of the arbitrator is CONFIRMED.

21

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

September 8, 1995

cc:  Daniel A. Laufer, Esq.
     Michael E. Goldstein, Esq.
     Richard V. Wiebusch, Esq.