USCA1 Opinion

 

  United States Court of Appeals For the First Circuit ____________________ Nos. 96-2246 97-1570 MCI TELECOMMUNICATIONS CORPORATION, Plaintiff, Appellee, v. MATRIX COMMUNICATIONS CORPORATION, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ [Hon. Patti B. Saris, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Dowd,* Senior District Judge. _____________________ ____________________ Richard W. Miller with whom Stephen R. Miller, Andrew C. __________________ __________________ __________ Gately, John D. Hanify, and Joseph A. Cortellini were on brief ______ _______________ ____________________ for appellant. Paul M. Smith with whom Ross B. Bricker, Terri L. Mascherin, _____________ _______________ __________________ Mark A. Berthiaume, Louis J. Scerra, Jr., and David J. Brecher ___________________ _____________________ _________________ were on brief for appellee. ____________________ January 27, 1998 ___________________  ____________________ *Of the Northern District of Ohio, sitting by designation. COFFIN, Senior Circuit Judge. The parties in this case have ____________________ been engaged in a heated battle over the proper setting for their underlying legal dispute. Appellee MCI Telecommunications Corp. insists that the conflict must be resolved through arbitration, while appellant Matrix Communications Corp. asserts that the arbitration clause in the parties' contract does not apply here, and that it is entitled to a judicial forum for its claims. The district court sided with MCI -- thus ordering arbitration -- and then rejected Matrix's motion under Fed. R. Civ. P. 60(b) to set aside that ruling based on newly discovered evidence. Matrix appeals both the judgment on the merits and the Rule 60(b) decision. After close review of the tangled procedural backdrop and the substantive issues, we affirm. I. Factual and Procedural Background _________________________________ Little needs to be said about the companies' underlying dispute, which arises from an October 1995 agreement (the "Agent Agreement") in which MCI gave Matrix limited agency to sell MCI services. The Agent Agreement provided for substantial commissions if Matrix generated a specified minimum amount of revenue for MCI. Matrix alleged, inter alia, that MCI improperly _____ ____ terminated the Agent Agreement eight months later, in June 1996, because Matrix was so successful in obtaining customers that MCI owed it more than one billion dollars in commissions that the corporation did not wish to pay. MCI countered that termination was proper because Matrix breached the terms of the Agent Agreement in various ways. -2- Following MCI's termination, Matrix filed suit in Massachusetts state court. MCI removed the action to federal court. It then moved to stay the litigation and compel arbitration, on the ground that the language of the arbitration clause in the Agent Agreement unambiguously evidenced the parties' intent to arbitrate all disputes arising from that agreement. The provision, contained in paragraph 22 of the Agent Agreement, states: Any dispute relating to this Agreement shall be submitted for binding arbitration in accordance with the rules contained in MCI Tariff FCC No. 1 and judgement[sic] on any award entered therein may be entered in any court of competent jurisdiction. Matrix opposed the motion to stay, arguing that, because MCI Tariff FCC No. 1 ("the Tariff") expressly limited arbitration to customer billing disputes of $10,000 or more, and Matrix neither was a customer nor had a billing dispute of any amount with MCI, the arbitration clause did not apply to its dispute.1  ____________________ 1 A tariff is a detailed compilation of charges, regulations and other relevant information about the provision of telecommunications services to the public that common carriers like MCI are required to file with the FCC. MCI Tariff FCC No. 1 is a voluminous document whose "Section B," labeled "Rules and Regulations," spans 34 pages and contains nineteen separate rules. Rule No. 7 is labeled "Payment Arrangements" and has twenty-one subsections. One of those subsections, B-7.13, is entitled "Arbitration of disputes," and states, in part: All disputes concerning or affecting payment of invoices issued after February 28, 1994 for charges totaling $10,000 and above may be resolved through binding arbitration. Subsection B-7.13 is further divided into numerous parts that detail the procedures to be used in such arbitrations. Section .1327, for example, requires the Responding Party to file a written answer within 17 days after the arbitration commences; -3- Judge Harrington of the United States District Court for the District of Massachusetts held a hearing on MCI's motion to compel arbitration on September 27, 1996. Later that day, he signed an order granting the motion, concluding that the arbitration clause unambiguously reflected an intention by the parties to arbitrate all disputes relating to the Agreement. In ___ his view, the Tariff was referenced not to define the scope of the agreement to arbitrate but to provide the procedural rules under which any arbitration would take place.  The same day, Matrix filed a notice of voluntary dismissal under Fed. R. Civ. P. 41(a)(1)(i).2 In a letter to Judge Harrington, Matrix's counsel explained that the company had decided to ask the arbitrator to rule on whether Matrix could receive all the relief it sought through arbitration. If so, Matrix would consent to continue the arbitration; if not, Matrix would refile its action in federal court. Judge Harrington dismissed the action. On September 30, the day both the order compelling arbitration and the grant of dismissal were entered on the docket, Matrix initiated the  ____________________ section .133 directs the case manager to hold an administrative conference within nine days of the arbitration's commencement; under section .1341, the appointed arbitrator may be removed only for bias or "other good cause"; section .135 provides for an exchange of documents and other information within 23 days after the arbitration commences; and section .1391 provides for the privacy of all arbitration conferences and hearings.  2 Although Judge Harrington may have ruled before Matrix filed for dismissal, it appears that Matrix did not learn of the ruling until later, and believed at the time it filed that the decision would not be made for several days. -4- arbitration by filing a claim with J.A.M.S./Endispute ("JAMS"), the arbitration administrator designated by MCI in its Tariff. Matrix argued to the arbitrator, as it had to the court, that its claims were not arbitrable, and again relied on a reading of the arbitration clause that limited its scope to billing disputes exceeding $10,000. MCI responded two days later, on October 2, by filing its own action in federal court seeking to compel arbitration of Matrix's claims. Although Matrix was at that point participating in arbitration, MCI was concerned that Matrix would not follow through if the arbitrator decided the threshold questions against Matrix's position. Because of his involvement in the earlier proceeding, Judge Harrington was assigned the MCI action. Without additional hearings or any responsive pleading from Matrix, he entered an order on October 10 compelling Matrix to arbitrate all of its claims and awarding MCI attorney's fees. Meanwhile, the arbitration that Matrix had initiated went forward, and, on December 10, 1996, the arbitrator ruled that Matrix's claims were arbitrable but that certain types of relief sought by Matrix, including multiple damages and attorney's fees, were unavailable in the arbitration because the Tariff barred such remedies. In February 1997, Matrix filed a motion in district court under Fed. R. Civ. P. 60(b), seeking relief from the October 10 order. Matrix contended that MCI had fraudulently induced it to enter into the arbitration clause in the Agent Agreement by concealing an agreement between JAMS and MCI that -5- provided for a close working relationship between the two companies and specified various payments and services to be given by MCI to JAMS. Matrix argued that the MCI/JAMS Agreement constituted newly discovered evidence of bias on the part of JAMS in favor of MCI. MCI opposed the motion, filing affidavits and other materials in support of its position that the JAMS Agreement had not been concealed and did not evidence bias on the part either of JAMS, or, more importantly, the arbitrator. Following a hearing, District Court Judge Saris denied the Rule 60(b) motion,3 concluding that Matrix had failed to show the elements necessary for post-judgment relief, see Hoult v. Hoult, ___ _____ _____ 57 F.3d 1, 5-6 (1st Cir. 1995). See infra at 16. ___ _____ Matrix appeals from the October 10, 1996 order compelling arbitration of its claims, and the March 27, 1997 denial of its rule 60(b) motion. II. Discussion __________ Before discussing the district court's October 10 judgment and its subsequent rejection of Matrix's Rule 60(b) motion, we must address a threshold issue raised by MCI. It claims that, because Matrix voluntarily submitted the issue of arbitrability to the arbitrator, who then determined that Matrix's claims are arbitrable, Matrix cannot at this juncture challenge the arbitrator's authority to hear the case. This appeal, MCI contends, is moot.  ____________________ 3 The case had been reassigned to Judge Saris subsequent to Judge Harrington's October 10, 1996 order. -6- We have little difficulty in concluding that the appeal should go forward. From the outset, Matrix explicitly advised the district court that it would return to the courtroom if the arbitrator ruled that Matrix could not obtain all the relief it sought in the arbitral forum. Although MCI cites language suggesting that Matrix later agreed to arbitrate its claims if the arbitrator ruled that they were arbitrable, we are persuaded that that language was unfairly drawn out of context and that Matrix's actual position has been consistently in opposition to resolving its claims through arbitration unless it were possible to obtain full relief. Indeed, we think it disingenuous, and bordering on effrontery, for MCI to suggest otherwise. We now turn to the issues raised by Matrix on appeal. A. The October 10 Ruling _____________________ At the outset of our analysis, it is worth recalling the context of the district court's decision on October 10 to compel arbitration. The motion on which the court ruled was filed by MCI on October 2. Only three working days earlier, on September 27, the court had held a hearing on arbitrability pursuant to Matrix's action, and had concluded that the Agent Agreement's ________ arbitration clause embraced all disputes. That decision was not ___ enforced then because, virtually contemporaneously, Matrix dismissed its suit. Seeking to resolve the arbitrability question, MCI jumped in with its own action, and the court responded on October 10 by compelling arbitration, thereby -7- effectively (though not technically) reinstating its earlier decision.4 If review of that decision posed only the question whether the court properly interpreted the Agent Agreement to compel arbitration of the parties' dispute, our task would be straightforward and relatively easy. But several factors affect our analysis, two of which complicate the inquiry. First, the court ruled before Matrix had answered MCI's complaint seeking to compel arbitration, and without a hearing, although Section 4 of the Federal Arbitration Act states that "[t]he court shall hear the parties" before ordering arbitration to proceed.5 The second difficulty is that Matrix's appellate challenge to the arbitration clause includes arguments that the district court never considered, an omission that typically forecloses us from taking them into account. See United States v. Bongiorno, 106 ___ _____________ _________ F.3d 1027, 1034 (1st Cir. 1997). The two problems obviously are  ____________________ 4 Matrix complains that the district court wrongly "based" its October 10 order on the September 27 order, which had become a "nullity" once Matrix dismissed its suit. Although Judge Harrington's October 10 order stated that it was "[i]n accordance with" the earlier decision, we take that as a shorthand reference to the content of that decision -- which he chose not to repeat - - rather than as a statement of precedent governing the October 10 ruling. 5 The relevant portion of the statute states: The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. 9 U.S.C. 4. -8- intertwined; Matrix logically points out that it had no opportunity to make any arguments to the district court because, ___ in its view, the court ruled prematurely. The third factor, somewhat simplifying our task, is that Matrix asserts that it does not challenge any procedural flaws in the district court's ruling, specifically waiving its complaints about the speed of the court's judgment and its failure to hold a hearing. It maintains that we should resolve "the underlying issue of whether Matrix must arbitrate its claims against MCI since such a determination is largely a question of law in which no material facts are in dispute." Procedural errors alone, therefore, are waived as a basis for vacating the district court's judgment.6 We address first the straightforward issue: whether the arbitration clause in the Agent Agreement applies to the present conflict.7 We think it does, finding unpersuasive Matrix's argument that the reference to the Tariff in that clause meant that the Agent Agreement limited arbitration only to customer billing disputes in excess of $10,000 -- the types of claims specifically arbitrable under the Tariff. Like the district court, we think the only sensible reading is that the Tariff was incorporated to provide a set of procedural rules for  ____________________ 6 In any event, as we discuss infra at 13-14, Matrix's _____ failure to raise issues before the district court in a motion for reconsideration bars them on appeal. 7 Our review on this question is de novo. See Keystone __ ____ ___ ________ Shipping Co. v. New England Power Co., 109 F.3d 46, 50 (1st Cir. ____________ _____________________ 1997). -9- arbitrations arising from the Agent Agreement. Not only is the opening language of the arbitration clause in the Agent Agreement broad -- "any" dispute relating to this agreement "shall" be submitted for arbitration -- but the limited construction proposed by Matrix would have the absurd result of entirely negating the arbitration provision. Under Matrix's view, because the Agreement established an agency relationship between MCI and Matrix, and the Tariff provided for arbitration only of customer ________ billing disputes, no issue arising between the two parties to the Agent Agreement could fall within the arbitration clause. Matrix explains this disjunction by arguing that the clause was inserted to specify the dispute resolution procedure for customers brought to MCI by Matrix. We find this argument to be implausible. Either the MCI Tariff would directly govern the customers' claims -- making reference to the Tariff in the Agent Agreement unnecessary -- or the customers themselves would have to agree to arbitration. The Tariff language, moreover, reinforces our reading of the Agent Agreement's arbitration provision. In subsection 7.13, the portion titled "Arbitration of disputes," see note 1 supra, the ___ _____ Tariff states that arbitrations "shall be conducted under the arbitration rules and procedures set forth in Sections B-7.131 through B-7.139 (Rules)," which account for more than four pages of text. Thus, while all of Section B of the Tariff carries the heading "Rules and Regulations," this portion of Rule 7, which governs arbitration, makes another, limited use of the term -10- "Rules" to denote the specific provisions relating to arbitration. It is much more reasonable to construe the use of the word "rules" in the Agent Agreement's arbitration clause to refer to the limited set of rules concerning arbitration than to all nineteen rules contained in Section B of the Tariff on a broad range of subjects. In addition, when viewed against the backdrop of the federal policy favoring arbitration, see, e.g., Volt Info. Sciences, Inc. ___ ____ _________________________ v. Board of Trustees, 489 U.S. 468, 475-76 (1989); Moses H. Cone _________________ _____________ Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 _______________ _______________________ (1983),8 and the generous reading given to broadly worded commercial arbitration agreements, see, e.g., Raytheon Co. v. ___ ____ ____________ Automated Bus. Sys., 882 F.2d 6, 9-11 (1st Cir. 1989), the ____________________ provision here cannot bear the interpretation Matrix seeks to assign to it. We thus agree with the district court that the arbitration provision contained in paragraph 22 applies to any dispute relating to the Agent Agreement, and that the Tariff was incorporated by reference merely "to guide an arbitrator as to how he should conduct his hearing." Having concluded that paragraph 22 requires arbitration between these parties, we must confront Matrix's assertion that it was duped into accepting the provision by representations from  ____________________ 8 The Supreme Court in Moses H. Cone Memorial Hosp. stated _____________________________ that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." 460 U.S. at 24-25. -11- MCI officials that the clause applied only to billing disputes involving customers brought to MCI by Matrix. Fraud in inducing acceptance of the arbitration clause unquestionably would negate the contractual agreement on that issue. See generally Prima ___ _________ _____ Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 & ___________ _________________________ n.12 (1967); see also Three Valleys Mun. Water Dist. v. E.F. ___ ____ ________________________________ ____ Hutton & Co., 925 F.2d 1136, 1139-40 (9th Cir. 1991); Wick v. ____________ ____ Atlantic Marine, Inc., 605 F.2d 166, 168 (5th Cir. 1979)("[i]f . _____________________ . . the arbitration clause was induced by fraud, there can be no arbitration"). As noted above, however, Matrix never raised this issue of fraud before the district court,9 a default that implicates our bedrock principle that new arguments may not be made on appeal.10 See Bongiorno, 106 F.3d at 1034; Lawton v. State Mut. Life ___ _________ ______ ________________ Assurance Co. of Am., 101 F.3d 218, 222 (1st Cir. 1996). But _____________________ applying this rule to these circumstances presents something of a puzzle. Matrix maintains that it cannot be penalized for failing to assert all theories because the district court gave it no ___ opportunity to offer any, having ruled without a hearing and  ____________________ 9 In fact, in its Memorandum in Opposition to Defendants' Motion to Stay Action and Compel Arbitration (in the first, Matrix-filed lawsuit), Matrix stated: "Matrix does not contend that the parties have not agreed to arbitrate pursuant to the Tariff Rules, and therefore raises no questions about the existence or validity of the arbitration agreement generally." 10 In reviewing the district court's substantive ruling, we may not consider materials added to the record in connection with the Rule 60(b) motion. See J. Geils Band Employee Benefit Plan ___ ____________________________________ v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1250 (1st Cir. ____________________________ 1996).  -12- before Matrix answered MCI's complaint. Seeking to avoid a remand, Matrix waives any claim that the court's procedure was improper and contends that the questions we face are legal in nature and thus suitable for resolution by the appellate court. Although we do not wish to condone precipitous action by the district court (and the procedural irregularities), we have some difficulty with Matrix's position. First, while interpretation of the arbitration provision presents a legal question that is as suitable for our review as for the trial court's, the issue of fraud is decidedly fact-based and thus inappropriately brought to us first. We may not assume the trial court's role of factfinder. In addition, Matrix's assertion that it had no opportunity to raise the issue of fraud before the district court is at least somewhat disingenuous. Only days before MCI filed its action, the district court had held a hearing on the enforceability of the Agent Agreement's arbitration provision -- with no suggestion of fraudulent inducement. Putting to one side the technical errors, which Matrix waives, the court reasonably could assume that Matrix's position with respect to the arbitration clause would be the same a week later. It is theoretically possible, of course, for Matrix to have changed its strategy during that interim, and for the district court's quick action thus to have deprived Matrix of its most direct opportunity to air the claim of fraud. If that were the case, however, we would expect Matrix to have alerted the court to its new position through a motion for reconsideration. -13- Particularly when a new theory turns on questions of fact, we are disinclined to stray from our longstanding raise-or-waive rule. If Matrix did not have the information within the post-trial motion period, its only recourse was through its 60(b) motion.  In short, neglecting to seek reconsideration meant omission before the trial court of the fraud theory upon which Matrix now wishes to rely. Although the circumstances here are peculiar, we conclude that Matrix's "failure to move for reconsideration of the district court order should not be excused," Vanhaaren v. _________ State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 5 (1st Cir. 1993). _______________________________ Cf. Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 31 (1st Cir. ___ _________ _____________________ 1996) ("[T]his court from time to time has refused to permit appellants to take advantage of supposed oversights that had not been called to the district court's attention by way of a timeous motion to reconsider."); United States v. Schaefer, 87 F.3d 562, _____________ ________ 570 n.9 (1st Cir. 1996) (failure to move to reopen the proceedings or for reconsideration undercuts claim of surprise about use of police report in suppression hearing); Beaulieu v. ________ IRS, 865 F.2d 1351, 1352 (1st Cir. 1989) ("[I]t is a party's ___ first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal."). We therefore conclude that Matrix has forfeited its claim that the arbitration clause should be invalidated on the basis of MCI's alleged statements that the arbitration clause did -14- not apply to the Agent Agreement.11 Consequently, we affirm the district court's October 10 judgment compelling arbitration.12 B. The Rule 60(b) Motion _____________________ Matrix's effort to undo the October 10 decision via Rule 60(b) rests on the agreement establishing JAMS as the administrator of MCI's arbitration program. Under Rule 60(b)(2),  ____________________ 11 We recognize that Matrix's waiver of procedural errors was motivated by a desire to have its claims heard promptly, in this court. Omission of the hearing required by Section 4 of the Arbitration Act also could have been addressed by the district court if brought to its attention on a motion for reconsideration, and, even if the issue were not waived, we would be inclined to view it as defaulted. 12 Equally unavailing is Matrix's new contention that the Agent Agreement's arbitration clause is invalid because the Tariff arbitration rules foreclose remedies, such as multiple damages, to which it is entitled. Putting aside the question of waiver, this argument must be brought to the arbitrator because it does not go to the arbitrability of the claims but only to the nature of available relief. See Great W. Mortgage Corp. v. ___ ________________________ Peacock, 110 F.3d 222, 230-31 (3d Cir. 1997) ("Any argument that _______ the provisions of the Arbitration Agreement involve a waiver of substantive rights afforded by the state statute may be presented in the arbitral forum. It would be anomalous for a court to decide that a claim should be referred to an arbitrator rather than a court, and then, by deciding issues unrelated to the question of forum, foreclose the arbitrator from deciding them."); PaineWebber Inc. v. Elahi, 87 F.3d 589, 599 (1st Cir. _________________ _____ 1996) ("[T]he signing of a valid agreement to arbitrate the merits of the subject matter in dispute presumptively pushes the parties across the `arbitrability' threshold; we will then presume that other issues relating to the substance of the dispute or the procedures of arbitration are for the arbitrator.") Matrix's reliance on Graham Oil Co. v. ARCO Prods. Co., 43 ______________ ________________ F.3d 1244 (9th Cir. 1994), is misplaced because, unlike the plaintiffs there, Matrix's claims are not brought under a statute specifically designed to protect bargaining rights. The applicable precedent in our circuit is instead that parties may contract to limit remedies in arbitration. See Raytheon Co. v. ___ ____________ Automated Bus. Sys., 882 F.2d 6, 12 (1st Cir. 1989); see also ___________________ ___ ____ Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 60-62 ___________ _____________________________ (1995) (finding that arbitration agreement did not include "an unequivocal exclusion of punitive damages claims").  -15- the district court has discretion to vacate a judgment based upon "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." See Hoult, 57 F.3d at 5-6.13 To prevail, a moving party ___ _____ must demonstrate that "the missing evidence was `of such a material and controlling nature as [would] probably [have] change[d] the outcome.'" Id. at 6 (citations omitted). ___ Matrix argues that the MCI/JAMS Agreement easily satisfies both the "newly discovered" and "material and controlling" impact prongs of this standard. First, it asserts that it had no ability to discovered the concealed agreement, which it contends  ____________________ 13 Although Matrix relied on both subsections (2) and (3) of Rule 60(b) in the district court, its briefs on appeal do not refer to subsection (3), which provides for relief from judgment based upon fraud, misrepresentation, or other misconduct. See ___ Anderson v. Cryovac, Inc., 862 F.2d 910, 924 (1st Cir. 1988) ________ ______________ (setting forth the standard applicable to 60(b)(3) claims: retrial mandated only when the challenged misconduct has "substantially" interfered with aggrieved party's ability to fully and fairly prepare for and proceed at trial). Matrix's reply brief contained no such argument even in the face of MCI's assertion in its brief that the 60(b)(3) claim was waived. Matrix does argue generally, however, that the district court orders should be vacated because of fraudulent conduct and misrepresentations by MCI. To the extent that Matrix has not waived a 60(b)(3) claim by failing to brief it fully, we find no abuse of discretion in the district court's rejection of that claim, as we agree with its conclusion that lack of access to the MCI/JAMS Agreement was inconsequential in the proceeding before Judge Harrington. As Matrix posits, if the MCI/JAMS Agreement had been brought to Judge Harrington's attention, he would have had to consider, in addition to the contractual language, "whether a reasonable person would have agreed to an arbitration provision that called for JAMS to handle the arbitration of certain disputes, in view of the MCI/JAMS Agreement." As our discussion of Matrix's 60(b)(2) claim demonstrates, see infra, ___ _____ access to the MCI/JAMS Agreement would not have added measurably to Matrix's effort to invalidate the Agent Agreement's arbitration provision. -16- even JAMS' general counsel was unaware of until this litigation commenced.14 Second, Matrix emphasizes that the MCI/JAMS Agreement reveals an improper relationship involving "substantial financial and reporting ties" between MCI and JAMS, and it argues that the Agreement's terms are so obviously suggestive of bias in favor of MCI that its mere existence is enough to invalidate the contested arbitration provision.  The district court, after a hearing, found Matrix's argument lacking in several respects. We may reject its judgment only upon finding an abuse of discretion, see Ahmed v. Rosenblatt, 118 ___ _____ __________ F.3d 886, 891 (1st Cir. 1997); Hoult, 57 F.3d at 3. We are _____ unable to do so. Judge Saris initially concluded that Matrix had failed to show that, with due diligence, it could not have discovered the evidence earlier. She pointed out that Matrix conceded at oral argument that corporate sponsored arbitration programs are commonplace, and that the MCI Tariff named JAMS as the company's arbitration administrator. Had Matrix been concerned about the details of the arrangement, she observed, it could have sought to discover them.  ____________________ 14 Although Matrix asserts that JAMS' general counsel "professes he was unaware of the MCI/JAMS Agreement until this litigation commenced," the attorney, Michael Young, actually stated that he was unfamiliar with the terms of the agreement, _____ not that he was unaware of any contractual relationship. Matrix's attorney states that he discovered the agreement in November 1996 as a result of an offhand remark by an attorney in an unrelated case. -17- Matrix argues on appeal, however, that it was essentially foreclosed from conducting discovery by the sequence of proceedings in the district court. In the original Matrix lawsuit, MCI secured an extension of time to comply with its obligation to make the voluntary disclosures required under Fed. R. Civ. P. 26, which had the effect of holding off other discovery. The court then granted the motion to compel arbitration before the extended time period had expired. Matrix argues that MCI therefore managed to avoid producing any documents, including the undisclosed MCI/JAMS Agreement. In the subsequent MCI lawsuit, no opportunity for discovery was presented because the court's ruling preceded any action by ___ Matrix. We need not resolve whether the district court erred in finding that Matrix did not exercise due diligence with respect to the MCI/JAMS relationship because we conclude, infra, that the _____ Agreement between them was not likely to have had an effect on Judge Harrington's decision. Before moving on to the materiality discussion, however, we wish to note that MCI's failure to make the Agreement available when it first was requested from JAMS in November 1996 is incomprehensible to us.15 Its refusal to do so  ____________________ 15 Matrix on November 8 requested that a copy of the Agreement be provided before a meeting scheduled with the arbitrator for November 15. In a reply sent on November 15, the JAMS case manager directed Matrix to request the document via subpoena as provided in the Tariff Arbitration Rules. A conference was held on November 22 with counsel for both parties and the arbitrator. Matrix again requested a copy of the Agreement, but MCI refused to turn it over unless Matrix signed a strict confidentiality agreement. Matrix would not sign such an -18- undoubtedly fueled the already bitter nature of this litigation, and intensified the wrangling over the Agreement's contents. Moreover, while the provisions of the MCI/JAMS agreement are not sufficiently troublesome to warrant the extraordinary relief for which Rule 60(b)(2) is reserved, they do include matters unquestionably of interest and concern to parties contracting to arbitrate with MCI. Our judgment should not be taken to condone MCI's nondisclosure. Even if we were to conclude that the district judge erred in finding a lack of diligence, her judgment that "Matrix's motion flunks the materiality test" would stand as a separate barrier to relief. After noting that the burden is on the party presenting the new evidence to demonstrate that it would probably have changed the outcome, and that Matrix was not challenging the impartiality of the arbitrator selected by JAMS, Judge Saris considered the provisions of the MCI/JAMS Agreement that Matrix claimed were pivotal. She found only one that caused her to hesitate in finding that the Agreement was entirely immaterial. That provision precluded the arbitrator from making findings of fact and conclusions of law. See App. at 1190 (MCI/JAMS ___ Agreement at Section XIIE). Judge Saris ultimately concluded that the provision had no significant effect, and we agree.  ____________________ agreement. On December 10, the arbitrator entered an order that all documents exchanged in the arbitration would be confidential, but Matrix did not receive notice of the order until the next conference with the arbitrator, on January 8, 1997. The MCI/JAMS Agreement was given to Matrix at that conference.  -19- MCI is an institutional litigant and probably has no interest in having an arbitrator spell out findings and legal rulings that might be used against it in future cases with its customers. But there is no reason whatever to think that Matrix would have regarded such a position as material. Its contract does not involve ordinary customer disputes, and Matrix is fully capable of litigating the matters afresh whether before an arbitrator or in court. Indeed, Matrix' only explanation as to why it might have cared about the provision involves a terse suggestion that arbitrator findings and conclusions might help Matrix establish willfulness, a requirement that Matrix says is necessary to avoid a limitation on liability otherwise imposed by the Tariff. That limitation provision is not part of the Tariff arbitration rules, however, and is therefore inapplicable.16 MCI argued that the liability limitation is clearly directed under the Tariff to delays and installation and like matters involving MCI's relations with its customers and has nothing to do with this case, and Matrix is visibly silent on this issue in its reply brief. And, as it happens, the arbitrator in this case does propose to make findings and conclusions.  ____________________ 16 We note that, like the arbitration rules in the MCI Tariff, the MCI/JAMS Agreement explicitly states that it covers the arbitration of customer payment disputes over $10,000. The ______________________________________ parties seem to assume that the Agreement also applies to other arbitrations administered by JAMS for MCI, and we likewise are presuming its relevance here.  -20- An additional factor reinforces the conclusion that the provision was immaterial. "It has long been settled that arbitrators are not required to make formal `findings of fact' to accompany the awards they issue. Indeed, `[a]rbitrators have no obligation . . . to give their reasons for an award at all.'" Raytheon Co., 882 F.2d at 8 (citation omitted). See also _____________ ___ ____ Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 240 n.9 (1st ___________________________ ______ Cir. 1995) ("It is well established that arbitrators are not required to either make formal findings of fact or state reasons for the awards they issue.") Moreover, errors in an arbitrator's legal rulings or factual findings do not provide a basis for reversal. See, e.g., Prudential-Bache, 72 F.3d at 239 & n.6; ___ ____ ________________ Eljer Mfg., Inc. v. Kowin Dev. Corp., 14 F.3d 1250, 1253-54 (7th ________________ _________________ Cir. 1994); Advest, Inc. v. McCarthy, 914 F.2d 6, 8 (1st Cir. _____________ ________ 1990). We cannot see how prohibiting a feature of arbitration that was not guaranteed to begin with could be deemed sufficiently material to have negated a party's willingness to arbitrate.  Matrix also highlights various payments and "perks" that the MCI/JAMS Agreement requires to be furnished by MCI to JAMS, including provision of "[f]ree MCI 800 numbers," a "free MCI Mail Account," and "[t]wo free dedicated phone lines." These services, however, are for use in connection with the tasks JAMS is required to provide under the contract (such as 24-hour electronic docketing and toll-free response to inquiries from MCI customers about arbitration), and we see nothing sinister in the -21- communications company contracting to provide the "tools" for the work it seeks to obtain from its contractor, particularly when those tools are its stock-in-trade. Likewise, the payments specified in the MCI/JAMS Agreement are for services to be provided, plus a $40,000 start-up fee "to cover administration design, computer services and technical support". See App. at ___ 1192-95. Matrix knew from the outset, or should have known, that JAMS had a substantial relationship with MCI simply by virtue of its role as administrator of MCI's arbitration program. Matrix should have known as well that the two parties must have spelled out their working relationship in some form; we think it virtually inconceivable that there would be no written contract between them. Moreover, many of the terms that Matrix claims to find shocking in the MCI/JAMS Agreement were included in MCI's public request for bids for a contract to administer its arbitration program, meaning that those aspects of MCI's relationship with its arbitration administrator effectively were public knowledge when Matrix entered the Agent Agreement.17 With this much reasonably presumed to be already on the table, we are unpersuaded that the district court would have  ____________________ 17 For example, the MCI/JAMS Agreement requires JAMS to provide weekly reports on the status of current arbitrations, 24- hour electronic docketing containing any change in the status of cases, deadlines the parties must meet and any decisions that affect what the parties must do, a centralized case scheduling system, and an 800 number to handle inquiries about arbitration from MCI customers. All of these services were contained in the bid request. See App. at 1828-1830. ___ -22- deemed the additional information contained in the MCI/JAMS Agreement material to Matrix's decision to participate in the arbitration. None of the contacts between MCI and JAMS specified in the Agreement involve the arbitrators who are deciding cases,18 and Matrix's suggestion that any arbitrator working for JAMS would have an inherent bias toward MCI, as JAMS' customer, is contradicted by Matrix's explicit assurance that it did not doubt the impartiality of the arbitrator assigned to its case.19 We consequently hold that the district court did not abuse its discretion in denying Matrix's Rule 60(b) motion. In sum, Judge Harrington, as the appeal is presented to us, committed no reversible error in issuing the October 10 order granting MCI's motion to compel arbitration, and Judge Saris did  ____________________ 18 In fact, the MCI/JAMS Agreement states that arbitrators will be selected based on, among other factors, "absence of conflicts of interest with MCI," and "demonstrated neutrality and impartiality in professional practice". See Section XII(A). The ___ Agreement also provides: ENDISPUTE will ensure that arbitrators serving on the MCI panel have been screened for potential conflicts of interest with MCI prior to inclusion on the panel. When appointed to a particular proceeding, arbitrators will be required to disclose any conflicts of interest with MCI which may have developed during the interim since the arbitrator's inclusion on the panel. In addition, arbitrators will be screened prior to appointment to a particular arbitration for potential conflicts with the MCI customer who is a party to the case. Id. at (C). ___ 19 The arbitrator is the Honorable Robert L. Steadman, former chief justice of the Massachusetts Superior Court. -23- not abuse her discretion in rejecting a new trial under Fed. R. Civ. P. 60(b). Their judgments accordingly are affirmed. Each party to __________________________________________ ______________ bear its own costs. ___________________ -24-