<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1764

        PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, ET AL.,

                     Plaintiffs, Appellees,

                              and

            CONNECTICUT VALLEY ELECTRIC COMPANY and
          CENTRAL VERMONT PUBLIC SERVICE CORPORATION,

                              and

                  UNITIL CORPORATION, ET AL.,

               Plaintiffs/Intervenors, Appellees,

                               v.

     DOUGLAS PATCH, CHAIRMAN OF THE STATE OF NEW HAMPSHIRE
              PUBLIC UTILITIES COMMISSION, ET AL.,

                    Defendants, Appellants.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Ronald R. Lagueux, U.S. District Judge]

                             Before

                    Boudin, Circuit Judge,
                                
Bownes and Reavley, Senior Circuit Judges.

    Dennis Lane with whom Michael E. Tucci and Morrison & Hecker,
L.L.P. were on brief for defendants Douglas L. Patch, Bruce B.
Ellsworth and Susan S. Geiger.
    Sarah B. Knowlton, Steven V. Camerino and McLane, Graf,
Raulerson & Middleton, P.A. on brief for City of Claremont, New
Hampshire, Amicus Curiae.
    Douglas W. Smith, General Counsel, John H. Conway, Deputy
Solicitor, and Deborah B. Leahy on brief for Federal Energy
Regulatory Commission, Amicus Curiae.
    Philip T. McLaughlin, Attorney General, Martin P. Honigberg,
Senior Assistant Attorney General, Civil Bureau, James K. Brown,
John A. Shope and Foley, Hoag & Eliot LLP on brief for Jeanne
Shaheen, Governor of the State of New Hampshire, Amicus Curiae.
    F. Anne Ross and F. Anne Ross, P.C. on brief for Retail
Merchants Association of New Hampshire, New Hampshire Office of the
Consumer Advocate, Campaign for Ratepayers Rights, Community Action
Program, City of Manchester and Cabletron Systems, Inc., Amici
Curiae.
    Lee A. Freeman, Jr., and Allan B. Taylor with whom John F.
Kinney, James T. Malysiak, Glynna W. Freeman, Freeman, Freeman &
Salzman, P.C., Joseph M. Kraus, Vice President and General Counsel,
Central Vermont Public Service Corporation, Dom S. D'Ambruoso,
John T. Alexander, Ransmeier & Spellman, John B. Nolan, Allan B.
Taylor, Gary M. Becker, Robert W. Clark and Day, Berry & Howardwere on brief for appellees Connecticut Valley Electric Company,
Central Vermont Public Service Corporation, Public Service Company
of New Hampshire, North Atlantic Energy Corporation, Northeast
Utilities and Northeast Utilities Service Company.
    Scott J. Mueller, Paul K. Connolly, Jr., Susan L. Geiser,
Erica Tarpey and Leboeuf, Lamb, Greene & MacRae on brief for
appellees Concord Electric Company, Exeter & Hampton Electric
Company, Unitil Power Corp., and Unitil Corporation.     

December 3, 1998

                                
                                

 BOUDIN, Circuit Judge.  The question presented on this
appeal is whether a state plan deregulating the electric utility
industry in New Hampshire was properly enjoined by the district
court pending trial on the merits.  The injunction was originally
obtained by Public Service Company of New Hampshire ("PSNH") but
was later extended to protect the other electric utilities in New
Hampshire.  A separate question, decided today in a companion
decision in No. 98-1629, is whether the district court erred in
granting specific relief to Connecticut Valley Electric Service
Company ("Connecticut Valley"), arguably going beyond the
injunction against the plan.
                         I.  BACKGROUND
    PSNH is the largest electric utility in New Hampshire and
supplies about 70 percent of the retail electric power in the
state.  During the 1970s, PSNH began construction of a nuclear
generating plant in Seabrook, New Hampshire.  Delays and cost
overruns at Seabrook were so extensive that in 1988 PSNH was forced
to file for bankruptcy protection in New Hampshire.  It appears
that a state statute, passed to prevent recovery through rates of
Seabrook's construction-in-progress costs, contributed to the
debacle.
    The State of New Hampshire intervened in the bankruptcy
proceedings and ultimately a deal was hammered out.  A major out-
of-state utility--Northeast Utilities--agreed to acquire all of
PSNH's stock and, through a corporate affiliate (North Atlantic
Energy Corporation), it also took over Seabrook.  The price paid,
for the benefit of PSNH's creditors and stockholders, was $2.3
billion.  As part of the transaction, the State of New Hampshire
executed a rate agreement in November 1989 to permit Northeast
Utilities to recover its full investment.
    At the time, electric utilities in New Hampshire were
subject to traditional utility rate regulation--here, by the New
Hampshire Public Utility Commission (the "Commission")--through
which retail rates are set to permit a utility to recover its
prudently incurred costs, including a return on prudent investment
in the facilities used to provide service.  The rate agreement
secured by Northeast Utilities contained formulas for allocating
the recovery of the investment (including Seabrook) so that the
impact on retail rates would be spread out over time.
    The bankruptcy court approved the reorganization plan,
including the rate agreement, In Re Public Serv. Co., 114 B.R. 820,
843 (Bankr. D.N.H. 1990).  The New Hampshire legislature authorized
the Commission to review the rate agreement, N.H. Rev. Stat. Ann.
ch. 362-C (1995), and the Commission approved the rate agreement.  
In Re Northeast Utils./Public Serv. Co., 114 P.U.R.4th 385
(N.H.P.U.C. 1990).  The New Hampshire Supreme Court upheld the
approval.  Appeal of Richards, 590 A.2d 586 (N.H. 1991).
    The rate agreement assured PSNH of annual 5.5 percent
electric rate increases for a seven year period (now completed);
and it provided that PSNH could buy Seabrook-generated power at
prices sufficient to recover Seabrook costs.  Partly for these
reasons, New Hampshire electric rates rose sharply.  In response,
the New Hampshire legislature in 1996 adopted the Electric Utility
Restructuring Act, N.H. Rev. Stat. Ann.  374-F:1, et seq. (Supp.
1997), providing for the introduction of competition into the
electric utility industry in New Hampshire.
    Under this statute, the Commission conducted hearings and
on February 28, 1997, it issued a restructuring plan (the "Final
Plan" or "Plan") and a set of implementing orders.  See Order No.
22,514 (adopting general statewide Final Plan and Legal Analysis);
see also Orders No. 22,509-22,513 (specific utilities' interim
stranded cost rulings).  The Plan is extremely complicated in its
details but a brief summary of pertinent elements will suffice for
the present.
    First, the Plan provides that in several years all New
Hampshire electric utilities will be required to separate
("unbundle") their local distribution and transmission facilities
from their generation facilities, divest the latter and permit use
of their distribution facilities to carry--for a distribution
charge--electricity generated by other suppliers.  In effect,
customers could then choose the source of their electrical power,
the market would set prices through competition, and the Commission
would merely set distribution charges (primarily based on cost) for
the use of the distribution networks (which remain effective
monopolies).
    Second, during a phase-in period before unbundling and
competition among suppliers for customers, the Commission proposed
to continue to set retail rates for electricity supplied to
customers by the existing utilities.  However, it would also force
prices down to market levels determined by average regional rates,
with a possible upward adjustment of up to eight percent over cost
as determined by the Commission.  This period was to last two years
(originally starting January 1, 1998) beginning at the
implementation of utilities' compliance filings, after which the
unbundling and competition would occur.
    Third, recognizing that market-based rates would likely
not permit the utilities to recover all of their investment in
existing plant, the Commission provided for recovery of so-called
"stranded investment" both in the interim phase (through the
adjustment of up to eight percent) and in the final phase (by
allowing an increment to the distribution charge over and above
actual cost).  How much of the stranded investment would ultimately
be recovered through these mechanisms is a matter of substantial
dispute and depends in some measure on decisions yet to be made by
the Commission.
    In sum, the Commission's Final Plan proposed to end the
existing regime in which the agency set retail rates for electric
power in New Hampshire based on cost.  Operating in two phases, the
new regime, mixing elements of competition and regulation, pressed
toward market rates for retail power.  The utilities' ability to
recover their prudent investment in distribution, transmission and
generation facilities was, at the very least, cast in doubt.  This
is so because even where the investment was originally prudent,
full competition can easily make some of that investment
unrecoverable.
    On March 3, 1997, immediately after the Final Plan was
adopted, PSNH filed a 13-count complaint in federal district court
and requested a temporary restraining order against implementation
of the Plan.  PSNH argued that the Plan was preempted by specific
provisions of the Federal Power Act, 16 U.S.C.  791a to 825r,
under which the Federal Energy Regulatory Commission ("FERC")
regulates utilities; the Public Utilities Regulatory Policies Act
of 1978, Pub. L. No. 95-617, 92 Stat. 3117 (codified as amended in
scattered sections of 15 and 16 U.S.C.); and the Public Utility
Holding Company Act, 15 U.S.C.  79 to 79z-6.  PSNH also argued
that the Plan constituted an unconstitutional taking and violated
substantive due process, the Contracts Clause, the Commerce Clause,
and the First Amendment.   
    In support of its TRO request, PSNH submitted affidavits
including those of experts explaining that the adoption of the
Final Plan, unless enjoined, would force PSNH under established
accounting standards to write-off more than $400 million in
investment, effectively repudiating the November 1989 rate
agreement between New Hampshire and Northeast Utilities. In turn,
the write-off and the alleged repudiation would place the company
in default under a number of loan and credit agreements, prompting
creditors to accelerate the collection of over $1 billion in debt
and forcing PSNH into bankruptcy.
    On March 10, 1997, the district court held a hearing on
the TRO request at which both sides presented oral argument; the
Commission presented no counter-affidavits.  Persuaded that there
was a substantial threat to PSNH, the district court issued a TRO
against the Commission's Orders No. 22,512 (the Final Plan) and
22,514 (the implementing order as to PSNH) pending a hearing on
whether a preliminary injunction would issue.  The TRO stayed
Orders No. 22,512 and 22,514 only as they affected PSNH, but under
the state's statute, no utility is required to implement its
compliance filing until compliance filings representing at least 70
percent of retail electric sales--effectively, those covering PSNH-
-are being implemented.  See R.S.A. 374-F:4(IV) (1997).
    On March 20, 1997, the district court held an evidentiary
hearing.  PSNH presented four witnesses: the chief financial
officer of Northeast Utilities, a vice-president of Northeast
Utilities, a senior partner at an independent accounting firm, and
an investment banker.  They testified that adoption of the Plan,
which abandons the traditional cost-recovery regime for regulating
utility rates, would under established accounting standards cause
write-offs, trigger loan covenant defaults, prompt accelerated debt
collection, and force PSNH into bankruptcy.  Commission lawyers
cross-examined PSNH's experts but presented no opposing witnesses.
    On March 21, 1997, the court renewed the TRO in somewhat
revised language and asked for briefing on ripeness and abstention
objections offered by the Commission.  On April 28, 1997, the
district court rejected those defenses in Public Serv. Co. v.
Patch, 962 F. Supp. 222 (D.N.H. 1997) ("Patch I"), and rejected a
Commission claim that the court lacked jurisdiction under the
Johnson Act, 28 U.S.C.  1342.  The court said that its March 21,
1997, amended TRO would remain in effect pending further order by
the district court.
    In May 1997, further proceedings in the district court
were stayed by agreement of the parties so that mediation could be
attempted; the attempt failed and the stay was ultimately dissolved
in September 1998.  However, the district court took no further
action on the injunction proceedings until early 1998 while
awaiting the outcome of two related proceedings, in other forums,
that might affect the decision whether to maintain injunctive
relief.
    One was an appeal to this court by certain ratepayer and
other interests whose intervention motions had been rejected by the
district court in June 1997.  Public Serv. Co. v. Patch, 173 F.R.D.
17 (D.N.H. 1997) ("Patch II").  On this appeal, these parties
sought to raise  abstention and related objections that could prove
dispositive.  In February 1998, this court sustained the district
court's denial of intervention and refused to reach the abstention
issues.  Public Serv. Co. v. Patch, 136 F.3d 197 (1st Cir. 1998)
("Patch III").
    The other intervening event was the Commission's receipt
of petitions for reconsideration of its Final Plan and related
implementing orders.  These requests, filed in Spring 1997, raised
the possibility that the Commission might significantly alter the
Final Plan; in fact, the Commission stayed portions of the Plan and
implementing orders pending reevaluation (Order No. 22,548) and
deferred ruling on the requests until March 1998.  In this interim,
there is some indication that the Commission was negotiating
privately, at least with PSNH, in an effort to reach an
accommodation.
    During this hiatus in the PSNH litigation, a different
controversy developed in late 1997, primarily between the
Commission and another New Hampshire electric utility, Connecticut
Valley Electric Service Company.  The district court, having
allowed the other New Hampshire electric utilities to intervene in
PSNH's injunction action, considered in that court docket all
requests by other utilities for related relief.  As we will see,
the new controversy with Connecticut Valley became a springboard
for expanding injunctive relief to protect all of the utilities
against the Final Plan.
    On March 20, 1998, the Commission finally entered a new
order, Order No. 22,875, that modified the 1997 Final Plan and
resolved petitions for rehearing on company-specific implementing
orders.  The Commission deleted certain features of its Final Plan
that had made the Plan especially vulnerable to attack on grounds
of federal preemption.  In addition, the Commission cryptically
announced that it would permit PSNH to have cost recovery--of a
kind not clearly specified--in the course of further proceedings.  
Thereafter PSNH filed a further amended complaint in district court
renewing most of the same claims it had earlier made.
    On April 3, 1998, the district court held a hearing (one
of several described at length in our companion opinion) directed
primarily to relief sought by Connecticut Valley.  In the course of
that hearing, the district court expressed the view that its
earlier March 21, 1997, order obtained by PSNH had contemplated
that the Commission's Final Plan would not be implemented pendente
lite against any of the utilities.  On April 9, 1998, the court
entered a written amended preliminary injunction enjoining the
Commission pending further court proceedings from requiring any New
Hampshire utility to obey the Final Plan or to submit to orders
designed to implement that plan.   
    Incident to the April 1998 court proceedings, the
district court directed all parties to prepare for trial on the
request for a permanent injunction now supported by other utilities
as well as PSNH.  Although PSNH said that it was ready for trial
immediately, the Commission requested six months for discovery and
the district court ruled that discovery would close in October
1998, with a trial on the request for a permanent injunction toward
the end of November 1998.  That date has recently been extended
until February 1999 to permit more discovery.
    At the time of the April 1998 proceedings in the district
court, the Commission's new Order No. 22,875 modifying the original
Final Plan and implementing orders had only recently been issued,
but the district court had declined to address it immediately.  
Instead, on June 5, 1998, the district court held a further hearing
to consider among other things the extension of the preliminary
injunction to embrace the modified Final Plan order as well.  On
June 12, 1998, the district court issued an order enjoining the
implementation of Order No. 22,875.
    The Commission then appealed to this court.  In No. 98-
1764,  the Commission appeals from the June 12, 1998, order of the
district court enjoining the Commission from requiring any utility
to comply with the modified Final Plan or implementing orders; and
in No. 98-1629, the Commission appeals separately from the district
court's order of April 9, 1998, using that appeal as a vehicle to
address its separate dispute with Connecticut Valley.  Both orders
are effectively preliminary injunctions subject to immediate
appeal.  28 U.S.C.  1292(a) (1994).  In this decision, we are
concerned with review of the June 12, 1998, order.
    On appellate review of the grant or denial of a
preliminary injunction, the deferential standard of "abuse of
discretion" applies to judgment calls, by the district court, such
as those that involve the weighing of competing considerations.  
See K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st
Cir. 1989).  Abstract issues of law are subject to review de novoand findings of basic fact to the clear error standard.  See Ocean
Spray Cranberries, Inc. v. PepsiCo, Inc., No. 96-1948, 1998 WL
777475 (1st Cir. Nov. 12, 1998) at *14 & n.1.   
                     II.  THRESHOLD ISSUES
    Each side has raised threshold objections,  the
Commission to the district court's consideration of the complaint
and PSNH to the Commission's appeal to this court.  Since the
latter effectively disputes our authority to consider the former as
well as the merits of the injunction, we address first PSNH's
twofold claim: that the notice of appeal is defective and that in
any event the June 12, 1998, preliminary injunction is not an
appealable order as to PSNH.
    The first objection turns on the fact that the
Commission's notice of appeal named the Commission and no one else
as the appellant, while the named defendants in the district court
were the individual commissioners and not the Commission,
presumably because of Eleventh Amendment concerns.  This
discrepancy leads PSNH to say that the appeal is not taken by
anyone who was a party in the district court and is therefore
ineffective.
    Needless to say, there is no actual confusion as to the
commissioners' intent to appeal or any suggestion of unfairness.  
The complaint challenged the commissioners for official acts; it
even referred to them by way of shorthand as "the Commission."  The
individual commissioners appear in the caption of the notice of
appeal.  Under these circumstances, we think that the appeal should
have been understood by everyone as that of the original
defendants, the individual commissioners.  Fed. R. App. P. 3(c) &
advisory committee notes to 1993 amendment.
    The other objection has slightly more substance but not
enough to persuade.  PSNH points out that the Commission did not
seek to appeal from the March 21, 1997, order which was effectively
an appealable preliminary injunction, having occurred after a
hearing and without the 10-day limit applied to TROs.  See Fed. R.
Civ. P. 65(b).  PSNH argues that at least as to it, the preliminary
injunction of June 12, 1998, did no more than maintain the relief
granted earlier.  PSNH then argues that, because the latter added
nothing to the former, the Commission is circumventing the time
limit on the original appeal which was 30 days.  See Fed. R. App.
P. 4(a)(1).   
    Even though the statute says that appeal may be taken
from the "continuat[ion]" of an injunction, 28 U.S.C.  1292(a)(1),
PSNH's argument might have some force in some circumstances.  SeeSierra Club v. Marsh, 907 F.2d 210, 212-14 (1st Cir. 1990).  
However, here the June 12, 1998, injunction extended injunctive
relief--to PSNH quite as much as other utilities--to include the
modified Final Plan-- whereas earlier orders had addressed only the
original Final Plan.  Thus, the new injunction was not merely an
echo of the old and is independently appealable and properly before
us.  Cf. Gon v. First State Ins. Co., 871 F.2d 863, 866 (9th Cir.
1989).  
    Opposing PSNH, the Commission and amicus interests that
support it have advanced three reasons why the district court
should not even have considered the request for preliminary
injunction: alleged lack of ripeness, various of the so-called
abstention doctrines established by the Supreme Court, and the
Johnson Act's express restriction on district court injunctions
against state rate orders under certain circumstances.  The
district court addressed these objections at length in Patch I, 962
F. Supp. at 230-44.  Presented as objections to an appealable
preliminary injunction, these objections are now properly before
us.  Compare Patch III, 136 F.3d at 210.
    We begin with the ripeness question, which essentially
asks whether a case is premature.  Two aspects of prematurity
especially concern the courts:  one is whether the threat of injury
is sufficiently immediate, and the other is whether the issues
raised can properly be decided in the abstract or would benefit
from facts not yet known (e.g., where validity of the statute might
depend upon the circumstances in which it is applied).  SeeChemerinsky, Federal Jurisdiction  2.4 at 98, 101-109 (1989).
    In its famous Abbott trilogy, see Abbott Labs. v.
Gardner, 387 U.S. 136 (1967); Toilet Goods Ass'n v. Gardner, 387
U.S. 158 (1967); Gardner v. Toilet Goods Ass'n, 387 U.S. 167
(1967), the Supreme Court said that ripeness depends upon the
"fitness" of the issues for immediate review and the "hardship" to
the litigant in postponing judicial intervention.  See Abbott
Labs., 387 U.S. at 149.  Fitness and hardship involve matters of
degree, but there is no need to plumb the subject, since lack of
ripeness is the least plausible of the objections to the injunction
in this case.
    With regard to fitness for review, the Commission's Final
Plan adopted a specific and detailed structure for utility
deregulation and ratemaking in New Hampshire.  By the time of the
modified preliminary injunction issued on June 12, 1998, the
Commission had also disposed of requests for reconsideration.  
Further, the Commission issued a set of implementing orders,
effectively one to each utility.  These orders requested steps to
be taken, including the establishment of market-proxy retail rates,
the filing of information to calculate local distribution rates for
the next phase, and ultimately the institution of local
distribution tariffs to permit wheeling and the corporate
separation of distribution from generation.
    As for the other consideration under Abbott, hardship if
review is deferred, the affidavits submitted by PSNH assert (with
considerable supporting detail) that the adoption of the Final Plan
and implementing order would, unless enjoined, lead almost
immediately to a change in PSNH's status under accounting rules,
place the company in default as to various lines of credit, and
push it rapidly down the slope to near-term bankruptcy.  Of course,
the adequacy of this showing can be disputed, but the Commission
has thus far made little effort to do so.
    The amici brief of Retail Merchants Association of New
Hampshire, et al., is the strongest proponent of the ripeness
objection.  It argues that review is premature because the New
Hampshire Supreme Court is considering rulings requested by the
Commission relating primarily to the Contracts Clause argument,
and because the Commission has not yet made a final determination
as to the precise amounts that PSNH may recover as stranded costs,
a matter  that is still the subject of ongoing proceedings.  
    The pending state court proceeding does not render the
present case unripe.  Even if we focus only on the Contracts Clause
claim--most of PSNH's claims concern other matters--the state
court's view of the agreement would not necessarily resolve the
federal constitutional issue, cf. Rhode Island Laborers' Dist.
Council v. Rhode Island, 145 F.3d 42, 43 (1st Cir. 1998), even if
that view were adverse to PSNH.  And while a ruling adverse to the
Commission might lead to modification of the existing plan, the
fact remains that the existing plan threatens imminent harm,
assuming the truth of PSNH's affidavits is accepted.
    The more difficult question is whether ongoing Commission
proceedings may refine the Commission's stranded cost formulas in
ways that diminish the impact of its Final Plan and implementing
orders on PSNH.  In our view, the Commission's new but cryptic
suggestion of some kind of cost recovery for PSNH (already noted)
is too slim a basis for postponing review.  The modified Final Plan
itself is claimed by PSNH to inflict irreparable harm and, if the
new suggestion has altered matters, the Commission can raise the
issue in the district court in connection with the permanent
injunction.
    The second threshold objection is that the district court
should have refused the injunction on abstention grounds.  
Abstention is not one doctrine but several, and the strand that
most invites attention derives from Burford v. Sun Oil Co., 319
U.S. 315 (1943).  The fundamental concern in Burford is to prevent
federal courts from bypassing a state administrative scheme and
resolving issues of state law and policy that are committed in the
first instance to expert administrative resolution.  See New
Orleans Pub. Serv., Inc. v. New Orleans, 491 U.S. 350, 361-64
(1989); Bath Mem. Hosp. v. Maine Health Care Fin. Comm'n, 853 F.2d
1007, 1014-15 (1st Cir. 1988) (Breyer, J.).
    But Burford abstention does not bar federal court
injunctions against state administrative orders where there are
predominating federal issues that do not require resolution of
doubtful questions of local law and policy.  See New Orleans Pub.
Serv., 491 U.S. at 362; Bath, 853 F.2d at 1013.  In such cases,
Burford abstention is not required merely because the federal
action may impair or even entirely enjoin the operation of the
state scheme.  See Zablocki v. Redhail, 434 U.S. 374, 379 n.5
(1978); see also New Orleans Pub. Serv., 491 U.S. at 361-64; Bath,
853 F.2d at 1014-15.
    Thus focused, the Burford doctrine has no application to
most of the claims advanced by PSNH.  It does not require looking
beyond "the four corners" of the Final Plan, New Orleans Pub.
Serv., 491 U.S. at 363, to confirm that the Final Plan is intended
to shift from cost-based regulation to market-driven rates for
electricity.  To the extent that such a shift in regime is itself
claimed to violate the Contracts Clause, or interfere with FERC's
preemptive authority or contravene orders of the Seabrook
bankruptcy court, Burford abstention is not even arguable.  
    The amici, but not the Commission, rely on a second (and
older) abstention doctrine associated with Railroad Commission of
Texas v. Pullman Company, 312 U.S. 496 (1941).  Under Pullman,  
abstention may be warranted where state court resolution of an
issue of state law might avoid a federal constitutional issue.  
Pullman, 312 U.S. at 500-01.  Pullman abstention calls for deferral
of a case rather than dismissal and may be a matter of discretion.  
See Chemerinsky,  12.2.1, at 595, 603.
    Here, it is true that proceedings in the New Hampshire
Supreme Court (see note 7 above) could conceivably increase PSNH's
cost recovery and affect its Contracts Clause and confiscation
claims.  But the timing, outcome and consequences of the state-
court proceedings are uncertain, and PSNH is faced with an existing
modified Final Plan that will, if PSNH's affidavits are believed,
drive it shortly into bankruptcy (absent the injunction).  This is
not the kind of case for which the Pullman doctrine is designed.  
See United Servs. Auto. Ass'n v. Muir, 792 F.2d 356, 362-63 (3d
Cir. 1986).
    The last threshold barrier, relied on by the Commission
and both amici, is the Johnson Act, 28 U.S.C.  1342 (1994),
providing that if each of four conditions is met, the district
court "shall not enjoin" the operation of, or compliance with, "any
order effecting rates chargeable by a public utility and made by a
State administrative agency . . . ."  The Johnson Act operates only
where each of the following conditions is met:
         (1) Jurisdiction is based solely on
    diversity of citizenship or repugnance of the
    order to the Federal Constitution; and,

         (2) The order does not interfere with
    interstate commerce; and,  

         (3) The order has been made after
    reasonable notice and hearing; and,

         (4) A plain, speedy and efficient
    remedy may be had in the courts of such State.  
    Id.

    The modified Final Plan and the implementing orders are
orders affecting rates within the meaning of the Johnson Act,
compare Tennyson v. Gas Serv. Co., 506 F.2d 1135, 1140 (10th Cir.
1974), with Public Util. Comm'n v. United States, 355 U.S. 534, 540
(1958); and the utilities do not directly deny that the third and
fourth conditions are met.  Instead, they argue that jurisdiction
in this case is not based "solely on diversity of citizenship or
repugnance of the order to the Federal Constitution" and that the
orders "interfere with interstate commerce."   
    The Johnson Act was prompted by concerns akin to those
that later  gave rise to Burford abstention, see Alabama Pub. Serv.
Comm'n v. Southern R. Co., 341 U.S. 341, 357-58 (1951)
(Frankfurter, J., concurring), but the Johnson Act has a narrower
reach and that reach is more rigidly defined.  The statute does not
apply to claims based upon a congressional statute or federal
administrative rulings, even though these commands are ultimately
backed up by the Supremacy Clause (and are therefore arguably
"constitutional" claims).  The case law on this point is so clear
cut that no further discussion of the point is required.
    Several of PSNH's more important claims are based on
federal statutes, federal administrative rulings or both and are
therefore not barred by the Johnson Act.  PSNH's claims based
directly on the Constitution are less secure.  The literal language
of the Johnson Act leaves some room to argue that the
constitutional claims would also support relief simply because
jurisdiction over the case would not have been based "solely" on
diversity or constitutional grounds.  But the statute's evident
purpose is to bar injunctions based on constitutional violations
regardless of other claims in the complaint.
    If the district court finds that a permanent injunction
is supported only by constitutional claims, it may have to decide
this arguable conflict between language and purpose.  While we are
doubtful that the statute permits relief based on constitutional
claims, even though other claims may support jurisdiction, the
issue has not been adequately briefed, and we will not decide it.  
Of course, even a constitutional claim alone would permit relief if
the state action "interfere[s] with interstate commerce."  28
U.S.C.  1342(2); see also Public Util Comm'n v. United Fuel Gas
Co., 317 U.S. 456, 469-70 (1943); Tri-State Generation &
Transmission Ass'n, Inc. v. Public Serv. Comm'n, 412 F.2d 115, 118-
19 (10th Cir. 1969).
                        III.  THE MERITS
    Once past the threshold issues, we reach the familiar
four-part test for preliminary injunctions and the question whether
preliminary injunction in this case is justified.  The usual
requirements are (1) that the moving party show a likelihood of
success on the merits, (2) that irreparable injury be demonstrated
in the absence of an injunction; and (3) and (4) that injunctive
relief be found to be consistent with the equities and the public
interest.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102
F.3d 12, 15 (1st Cir. 1996).
    In the ordinary case where a preliminary injunction is
granted, the district court usually sets forth its reasons for
believing that a likelihood of success has been shown on one or
more claims, and opposing party tries to show on appeal why this
assessment is flawed or mistaken.  In this case, the district
court's assessment of the merits was foreshortened and the
Commission's brief on appeal does not seriously address the merits
of PSNH's claims.  This is a formidable handicap to an intelligent
discussion of the merits.
    The reasons why there is no full-scale appraisal of the
merits by the district court are severalfold.  The original TRO
request was accompanied by a reasonably extensive memorandum by
PSNH laying out its theories for asserting that the Final Plan and
implementing orders were unlawful, and by extensive affidavits
attempting to show irreparable injury of the most severe kind was
imminent.  In opposing the TRO, the Commission concentrated
primarily on disputing claims of irreparable injury and at later
stages, it pressed the abstention and other threshold claims
already discussed.  Possibly, it hoped to postpone a preliminary
ruling on the merits while making modifications in the Final Plan
that might strengthen the Commission's hand.
    Whatever the cause of this tactic, it led the district
court to eschew any formal or detailed discussion of PSNH's
likelihood of success on the merits akin to the court's thorough
discussion of the threshold issues such as abstention.  Still, this
is not a case where the district court ignored likelihood of
success:  a review of the transcript shows that the district court
did consider likelihood of success, that it was especially
impressed with PSNH's Contracts Clause claim and that it thought
that certain of the FERC preemption claims were substantial.
    On appeal, the Commission now does seek to dispute PSNH's
likelihood of success assertions; the Commission argues first and
most elaborately that "plaintiffs are unlikely to prevail on the
merits."  This court might be justified in passing by the argument
on the ground that it was not adequately developed below, see MCI
Telecomm. Corp. v. Matrix Communications Corp., 135 F.3d 27, 32
(1st Cir.), cert. denied, 118 S. Ct. 2370 (1998), but we address it
for several reasons:  some of the substance was presented to the
district court, the argument is essentially legal rather than
factual so lack of district court development is not a handicap,
and the impact of the injunction on a regulatory regime affecting
the public interest weighs heavily with us.
    Yet the Commission's main "merits" argument is almost
entirely beside the point.  The Commission lays out and supports
with citations the proposition that states have substantial
latitude in determining rate methodologies, that cost-of-service
rate making is not infallible, that unreasonably high rates may be
restrained, that constitutional considerations normally take
account of multiple interests, and that the Final Plan embodies a
regime that is generally reasonable and capable of adjusting to
individual circumstances.  Most of what the Commission says is
plausible in the abstract.
    The manifest difficulty is that these arguments respond
to none of the specific claims made by PSNH.  There is no adequate
discussion of the PSNH Contracts Clause claim or the related
argument that New Hampshire agreed in the bankruptcy proceeding to
allow full recovery of the Seabrook investment.  The Commission
meets PSNH's claims that the Final Plan invades FERC jurisdiction
or conflicts with FERC orders only by responding (in another
section of its brief) that the modifications produced by its order
on reconsideration have "mooted" the issue; however, the argument
made in this section addresses only one of PSNH's several FERC-
preemption arguments.
    The Retail Merchants' amicus brief makes a somewhat more
detailed argument under a heading concerning "likelihood of
success."  But this is actually a claim that PSNH's takings
argument is premature, as the Commission may or will allow some of
the disputed costs to be recovered; we have already addressed this
concern in connection with the ripeness issue.  The amicus brief
submitted by New Hampshire's Governor also discusses the merits,
but the only detailed argument is limited to claims that there is
no conflict between the Commission's modified Final Plan and FERC
orders or authority.  The FERC claims are only some of the many  
claims put forth by PSNH.
    Nevertheless, we have considered whether at least one or
more of the claims put forth by PSNH provides fair grounds for
further litigation--this lesser standard being defensible in light
of the rather powerful showing of irreparable injury made by PSNH.  
See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,
559 F.2d 841, 844-45 (D.C. Cir. 1977).  This standard is met by
PSNH's argument that New Hampshire effectively promised in the rate
agreement incident to the bankruptcy reorganization that PSNH or
one of its affiliates would be allowed to recover through PSNH
retail rates a specific investment of $2.3 billion; that the switch
to a market-based rate regime effectively nullifies this promise;
and that the promise is enforceable under Contracts Clause
jurisprudence.
    The state's involvement in the rate agreement, already
described, certainly makes a Contracts Clause claim plausible, even
if closer examination might defeat the claim or provide the state
a loophole.  See McGrath v. Rhode Island Retirement Bd., 88 F.3d
12, 16 (1st Cir. 1996).  Of course, the Johnson Act may well
preclude an injunction based solely on constitutional grounds, as
we discussed above.  But PSNH makes a similar argument that
disregard of the bankruptcy agreement conflicts with the bankruptcy
court's disposition of the Seabrook reorganization; if this version
has merit, the Johnson Act would not be a bar.
    In any case, claims based on FERC preemption are not
subject to the Johnson Act, and several such arguments pressed by
PSNH appear to be substantial.  One concern may have been resolved
by the modification order (eliminating obligatory filing of FERC
transmission tariffs with the Commission), and another argument
(whether the state has authority to order wheeling over local
distribution lines) might not--even if sound--affect the initial
decision to force retail rates toward market levels without actual
competition.
    However, PSNH's most far-reaching argument under the
Federal Power Act appears to be that the rate reductions
contemplated by the Commission would prevent full recovery by PSNH
of the cost of power that it is required to buy from Seabrook by
long-term contract made in connection with the bankruptcy
reorganization.  Under established doctrine, discussed at greater
length in our companion opinion, state agencies have limited
ability to disallow the cost of electricity supplied at rates
contained in tariffs filed with FERC.  In shorthand, the rate in
a tariff filed with FERC is the binding rate unless and until FERC
alters it.
    It is true that a state agency may be able to disallow
the cost of power purchases to the extent that they are imprudent,
unless those purchases are required by a federal mandate.  SeeMississippi Power & Light, 487 U.S. at 373-74; Nantahala, 476 U.S.
at 965.  But even if FERC's approval of the PSNH-Seabrook contract
does not create such a mandate--a point neither side has
discussed--the Commission does not claim that the contract entered
into as part of the state-endorsed reorganization was imprudent.  
And, unlike the Connecticut Valley contract discussed in the
companion case, the PSNH-Seabrook contract is not said to contain
a clause permitting termination on short notice.
    We thus conclude that PSNH has a sufficient claim on the
merits to permit a preliminary injunction. As to the remaining
three conditions, they can all be discussed together, because the
starting point for each is PSNH's claim that without the injunction
it would be driven rapidly into bankruptcy.  This is not only an
extreme form of irreparable injury but, if the threat is a real
one, would give PSNH a powerful equitable argument.  As for the
public interest, lower rates are always an attraction, but New
Hampshire itself has avowed that a second PSNH bankruptcy would not
be in the public interest.
    The question whether PSNH made a showing of threatened
bankruptcy is easy to answer in the affirmative.  It presented
extensive affidavits and then live witnesses, whereas the state did
no more than to seek to cross-examine.  Nothing in the examination
persuades us that the district court committed clear error in
finding the threat to be real.  Neither the Commission nor the
amici in their appeals briefs seek to discuss in detail PSNH's
evidence of irreparable injury.
    The Commission and amici say that the Commission's orders
leave some room for further adjustments that would increase the
ability of PSNH to recover more of its investment.  Yet PSNH's
witnesses said that bankruptcy would flow simply from the
Commission's decision to impose on it a rate regime designed to
lead to market-based rates.  And far from providing assurance that
the Northeast Utilities' investment will be recovered, the briefs
of the Commission contain disquieting references to the recovery of
prudent investment.
    We thus conclude on the present record, the district
court was entitled to issue a preliminary injunction in favor of
PSNH.  None of the pillars on which this conclusion rests is immune
to reexamination in connection with a permanent injunction or, at
any other time, if there are new developments to warrant a further
look.  And what has been said so far about the merits and
irreparable injury pertains to the injunction so far as it
restrains the Commission from applying the Final Plan and
implementing orders to PSNH.
    The district court's extension of the injunction to
protect all other New Hampshire electric utilities is more
troublesome.  Although the other utilities have joined in attacks
on the Final Plan similar to those made by PSNH, it is not clear
that they can assert the Contracts Clause or bankruptcy
reorganization arguments that made PSNH's case so appealing to the
district court.  Nor is it evident that utilities are
constitutionally insulated against losses that result merely from
a change in rate regulation that introduces competition.
    Curiously, the Commission itself has not sought to
distinguish the claims of the other utilities from those of PSNH by
arguing that even if the injunction was properly granted in favor
of PSNH, it is inadequately supported as to the other utilities.  
Possibly, this is because under the 70 percent requirement already
mentioned, the modified Final Plan cannot be fully implemented as
to any utility until it is applied to PSNH.  Nor does it appear
that the Commission pressed the district court for separate rulings
on likelihood of success and irreparable injury as to the other
utilities.
    Nevertheless, if after the hearing on the permanent
injunction the district court proposes to maintain an injunction to
protect all New Hampshire utilities against the application of the
modified Final Plan, then the court must explain how its
determinations support such an injunction as to the carriers otherthan PSNH.  We do not say this is impossible--it may depend in part
on elucidation as to the other utilities of some of the FERC issues
that are particulary difficult to unravel.  But we think it has to
be done if a permanent injunction extends beyond PSNH itself.
                     IV.  COLLATERAL ISSUES
    The Commission argues for the first time on appeal that
the injunction should be vacated because the district court failed
explicitly to consider whether the plaintiffs should be required to
post a security bond when receiving injunctive relief.  The
Commission did not raise this issue in the district court and has
therefore waived it.  See MCI Telecomm., 135 F.3d at 32; Aoude v.
Mobil Oil Corp., 862 F.2d 890, 896 (1st Cir. 1988).  Furthermore,
even if we were to reach this issue, the Commission has neglected
to explain what such a bond would cover and how it is justified.  
    The Commission also makes a generalized argument that the
injunction itself is vague or overbroad in enjoining the Commission
from "requiring plaintiffs to take any action under those
[specified], orders [establishing the modified Final Plan],
including the filing of compliance plans," except for voluntary
filings.  The Commission claims that it is unsure what is and is
not permissible, and it implies that this uncertainty inhibits its
ability to carry out its ordinary rate-regulation responsibilities
vis--vis the utilities--responsibilities that certainly continue
at the present time.
    Unlike in the cases cited by the Commission, see, e.g.,
Payne v. Travenol Labs., Inc., 565 F.2d 895, 898 (5th Cir.), cert.
denied, 439 U.S. 835 (1978), the injunction is not so sweeping and
vague as to violate the "command of specificity" set down in Fed.
R. Civ. P. 65(d), see Payne, 565 F.2d at 897; instead, it
identifies as the subject of the injunction the Final Plan and the
implementing orders that accompany it.  The Commission can ask the
district court for clarification if it thinks that some action it
is proposing to take might wrongly be viewed as trespassing on the
injunction.  The Commission is hardly going to be held in contempt
for an innocent misstep.
    Affirmed.

</body>

</html>